Monica A. BEAM, derivatively on behalf of MARTHA STEWART LIVING OMNIMEDIA, INC., Plaintiff,

v.

Martha STEWART; Sharon L. Patrick; Arthur C. Martinez; Naomi O. Seligman; Darla D. Moore; Jeffrey W. Ubben; and L. John Doerr, Defendants,

and

Martha Stewart Living Omnimedia, Inc., Nominal Defendants.

C.A. No. 19844–NC.

Court of Chancery of Delaware, New Castle County.

Submitted July 17, 2003.
Decided Sept. 30, 2003.

Pamela S. Tikellis, Robert J. Kriner and Brian D. Long, of Chimicles & Tikellis LLP, Wilmington, Delaware; Nicholas E. Chimicles and James R. Malone, Jr., of Chimicles & Tikellis LLP, Haverford, Pennsylvania; Lawrence A. Sucharow and Joel Bernstein, of Goodkind, Labaton, Rudoff & Sucharow LLP, New York, New York; and Reginald A. Krasney, Wayne, Pennsylvania, for Plaintiff, of counsel.

Andre G. Bouchard, of Bouchard Margules & Friedlander, Wilmington, Delaware; Barbara Moses, Tracey Kitzman and Alicia D'Angelo, of Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, New York, for Defendant Martha Stewart, of counsel.

A. Gilchrist Sparks, III and S. Mark Hurd, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Barry G. Sher and Brett D. Jaffe, of Fried, Frank, Harris, Shriver & Jacobson, New York, New York, for Defendants Sharon L. Patrick, Arthur C. Martinez, Naomi O. Seligman, Darla D. Moore, Jeffrey W. Ubben and Nominal Defendant Martha Stewart Living Omnimedia, Inc., of counsel.

Gregory V. Varallo, Lisa A. Schmidt, Kelly A. Green and Richard P. Rollo, of Richards, Layton & Finger, Wilmington, Delaware; David M. Furbush and Braden O. Wilhelm, of O'Melveny & Myers LLP, Menlo Park, California, for L. John Doerr, of counsel.

## *OPINION*

CHANDLER, Chancellor.

Monica A. Beam, a shareholder of Martha Stewart Living Omnimedia, Inc. ("MSO"), brings this derivative action against the defendants, all current directors and a former director of MSO, and against MSO as a nominal defendant. The

defendants have filed three separate motions seeking (1) to dismiss Counts II, III, and IV under Court of Chancery Rule 12(b)(6) for failure to state claims upon which relief may be granted; (2) to dismiss the amended complaint under Court of Chancery Rule 23.1 for failure to comply with the demand requirement and for failure adequately to plead demand excusal; or alternatively (3) to stay this action in favor of litigation currently pending in the U.S. District Court for the Southern District of New York.[1] This is the Court's ruling on these motions.

## I. FACTUAL BACKGROUND [2]

Plaintiff Monica A. Beam is a shareholder of MSO and has been since August 2001. Derivative plaintiff and nominal defendant MSO is a Delaware corporation that operates in the publishing, television, merchandising, and internet industries marketing products bearing the "Martha Stewart" brand name.

Defendant Martha Stewart ("Stewart") is a director of the company and its founder, chairman, chief executive officer, and by far its majority shareholder. MSO's common stock is comprised of Class A and Class B shares. Class A shares are traded on the New York Stock Exchange and are entitled to cast one vote per share on matters voted upon by common stockholders. Class B shares are not publicly traded and are entitled to cast ten votes per share on all matters voted upon by common stockholders. Stewart owns or beneficially holds 100% of the B shares in conjunction with a sufficient number of A shares that she controls roughly 94.4% of the shareholder vote. Stewart, a former stockbroker, has in the past twenty years become a household icon, known for her advice and expertise on virtually all aspects of cooking, decorating, entertaining, and household affairs generally.

Defendant Sharon L. Patrick ("Patrick") is a director of MSO and its president and chief operating officer. The amended complaint reports that in 2001, MSO paid Patrick a salary of $700,000, a $280,000 bonus, and granted her options for 130,000 Class A shares. She also serves as the secretary of M. Stewart, Inc., which is described in the complaint as "one of Stew-

---

1. Defendants MSO, Sharon L. Patrick, Arthur C. Martinez, Naomi O. Seligman, Darla D. Moore, and Jeffrey W. Ubben (collectively the "MSO defendants") move to dismiss the amended complaint under Court of Chancery Rule 23.1 for failure to make demand on MSO's board of directors and for failure to plead adequately why demand should be excused and to dismiss Counts II and IV under Court of Chancery Rule 12(b)(6) or alternatively to stay the action in favor of first-filed federal litigation. Defendant Martha Stewart moves to dismiss on the same bases as the MSO defendants, adopting their arguments and, in addition, to dismiss Count III pursuant to Rule 12(b)(6). Defendant L. John Doerr moves to dismiss the amended complaint for failure to make demand or properly to allege demand futility, adopting and supplementing the arguments of the MSO defendants and, in addition, to dismiss Count III pursuant to Rule 12(b)(6).

In her original motion, Stewart also sought to stay this action on the same grounds as the MSO defendants. In a letter to the Court, dated July 11, 2003, Stewart withdrew her motion to stay.

2. The facts in this Opinion are derived from the well-pled allegations of the amended complaint unless otherwise indicated. Counsel have apprised the Court of recent developments including the June 4, 2003 indictment and SEC action filed against Stewart and resultant management changes at MSO. The Court must, however, evaluate the facts as pled in the amended complaint in ruling on these motions to dismiss. For this reason, the facts as stated and discussed in this opinion are those pled in the amended complaint and do not take into account later developments.

art's personal companies."[3] Prior to Patrick's employment at MSO, she was a consultant to the magazine, *Martha Stewart Living,* and developed extensive experience in the media, entertainment, and consulting businesses. Patrick is also a longtime personal friend of Stewart.

Defendant Arthur C. Martinez ("Martinez") has been a director of MSO since January 2001. Martinez is the former chairman of the board of directors and chief executive officer of Sears Roebuck and Co. Martinez was also the chairman and chief executive officer of that company's retail arm, Sears Merchandise Group. Sears was a high-volume retailer of MSO products during Martinez's tenure there. He has served on the boards of Sears Roebuck and Co., Sears Merchandise Group, and Saks Fifth Avenue. In addition, Martinez now serves as a director of MSO, PepsiCo, Inc., Liz Claiborne, Inc., and International Flavors & Fragrances, Inc. and as the chairman of the Federal Reserve Bank of Chicago. A March 2001 article in *Directors & Boards* reported that Patrick and Stewart both consider Martinez to be "an old friend."[4] Also, Martinez was recruited to serve on MSO's board by then-board member Charlotte Beers ("Beers"), another "longtime friend and confidante"[5] of Stewart.

Defendant Darla D. Moore ("Moore") has been a director of MSO since September 2001, when Beers resigned and Moore replaced her Moore's professional background includes a partnership at Rainwater, Inc., a private investment firm, a managing directorship with Chase Bank, and service as a trustee of Magellan Health Services, Inc. Moore, too, is reported to be a longtime friend of both Stewart and Beers, as evidenced by a 1996 *Fortune*

magazine article highlighting the close friendship among the three women and by the amended complaint's report of Moore's attendance at a wedding reception in 1995, which was attended by both Stewart and Samuel Waksal and hosted by Stewart's lawyer, Allen Grubman.

Defendant Naomi O. Seligman ("Seligman") has been a director of MSO since 1999. She is a co-founder and senior partner of Cassius Advisors and a co-founder and former senior partner of Research Board, Inc. Seligman serves as a director of several public companies, including John Wiley & Sons ("JWS"), a publisher. The amended complaint relates a *Wall Street Journal* report that Seligman contacted the chief executive officer of JWS on behalf of Stewart to express concern over an unflattering biography of Stewart that was scheduled for publication by JWS.

Defendant Jeffery W. Ubben ("Ubben") has been a director of MSO since January 2002. He is the founder and managing partner of ValueAct Capital Partners, L.P. and a director of Insurance Auto Auctions, Inc. Ubben has formerly served as a managing partner and as a portfolio manager, working in the investment industry since at least 1987.

Defendant L. John Doerr ("Doerr"), is a former director of MSO. His tenure as a director ended in March 2002. Doerr is the general partner of a venture capital firm, Kleiner, Perkins, Caufield & Byers ("Kleiner, Perkins").

The amended complaint states that compensation paid to MSO's directors includes all of the following:

● $20,000 as an annual retainer;

---

**3.** Am. Compl. ¶ 3.

**4.** *Id.*

**5.** *Id.* ¶ 5.

- $1,000 for each meeting attended in person;

- $500 for each meeting attended telephonically; and

- $5,000 annually for serving as chairman of any committee.

Twenty-five percent of directors' fees are paid in shares of MSO's Class A common stock, with the remaining 75% payable either in Class A shares or cash at the choice of the director. In addition, MSO has a stock option plan for the directors.

The plaintiff seeks relief in relation to three distinct types of activities. The first involves the well-publicized matters[6] surrounding Stewart's alleged improper trading of shares of ImClone Systems, Inc. ("ImClone") and her public statements in the wake of those allegations. The second relates to the private sale of sizeable blocks of MSO stock by both Stewart and Doerr in early 2002. The third challenges the board's decisions with regard to the provision of "split-dollar" insurance for Stewart.

### A. Stewart's ImClone Trading

The market for MSO products is uniquely tied to the personal image and reputation of its founder, Stewart. MSO retains "an exclusive, worldwide, perpetual royalty-free license to use [Stewart's] name, likeness, image, voice and signature for its products and services."[7] In its initial public offering prospectus, MSO recognized that impairment of Stewart's services to the company, including the tarnishing of her public reputation, would have a material adverse effect on its business. The prospectus distinguished Stewart's importance to MSO's business success from that of other executives of the company noting that, "Martha Stewart remains the personification of our brands as well as our senior executive and primary creative force."[8] In fact, under the terms of her employment agreement, Stewart may be terminated for gross misconduct or felony conviction that results in harm to MSO's business or reputation but is permitted discretion over the management of her personal, financial, and legal affairs to the extent that Stewart's management of her own life does not compromise her ability to serve the company.

Stewart's alleged misadventures with ImClone arise in part out of a longstanding personal friendship with Samuel D. Waksal ("Waksal"). Waksal is the former chief executive officer of ImClone as well as a former suitor of Stewart's daughter. More pertinently, with respect to the allegations of the amended complaint, Waksal and Stewart have provided one another with reciprocal investment advice and assistance, and they share a stockbroker, Peter E. Bacanovic ("Bacanovic") of Merrill Lynch. Bacanovic, coincidentally, is a former employee of ImClone. When MSO made its initial public offering of Class A common stock in 1999, Bacanovic sold $10 million of the shares to Stewart's friends and family members, including Waksal and members of his family. Waksal has encouraged and assisted Stewart not only with regard to the purchase of ImClone stock but also has persuaded Stewart to invest in a venture fund he started, Scientia Health Group, and has helped Stewart and her friend, Beers, to become private investors in Cadus Pharmaceutical Corp.

---

6. The amended complaint specifically refers to a number of reports in the *New York Times,* an incident on the CBS broadcast of *The Early Show,* and at least one report in the *Wall Street Journal.*

7. Am. Compl. ¶ 18.

8. *Id.* ¶ 16 (quoting MSO's public offering prospectus).

prior to its initial public offering in 1996. Although the other investments recommended and facilitated by Waksal have thus far proven to be of no great news value, the ImClone investment—or more particularly Stewart's December 27, 2001 ImClone *divestment*—has been found to be somewhat more noteworthy. The speculative value of ImClone stock was tied quite directly to the likely success of its application for FDA approval to market the cancer treatment drug Erbitux. On December 26, Waksal received information that the FDA was rejecting the application to market Erbitux. The following day, December 27, he tried to sell his own shares and tipped his father and daughter to do the same. Stewart also sold her shares on December 27. That day she was traveling with another friend, Marianna Pasternak ("Pasternak"), when Stewart spoke with Bacinovic's assistant, Douglas Faneuil, and sold all of her ImClone shares. The next day, December 28, Pasternak's husband, Bart Pasternak, also sold 10,000 shares of ImClone. After the close of trading on December 28, ImClone publicly announced the rejection of its application to market Erbitux. The following day the trading price closed slightly more than 20% lower than the closing price on the date that Stewart had sold her shares. By mid–2002, this convergence of events had attracted the interest of the *New York Times* and other news agencies, federal prosecutors, and a committee of the United States House of Representatives. Stewart's publicized attempts to quell any suspicion were ineffective at best because they were undermined by additional information as it came to light and by the other parties' accounts of the events. Ultimately Stewart's prompt efforts to turn away unwanted media and investigative attention failed. Stewart eventually had to discontinue her regular guest appearances on CBS' *The Early Show* because of questioning during the show about her sale of ImClone shares. After barely two months of such adverse publicity, MSO's stock price had declined by slightly more than 65%. In August 2002, James Follo, MSO's chief financial officer, cited uncertainty stemming from the investigation of Stewart in response to questions about earnings prospects in the future.

### B. Private Sales of MSO Stock

In January 2002, Stewart and the Martha Stewart Family Partnership sold 3,000,000 shares of Class A stock to entities designated in the amended complaint as "ValueAct."[9] In March 2002, Kleiner, Perkins, acting through its general part-

9. The amended complaint uses the shorthand "ValueAct" as a designation for a combination of four interrelated business entities—two Delaware limited partnerships (ValueAct Partners and ValueAct Partners II), a British Virgin Islands company (ValueAct International), and a Delaware limited liability company (VA Partners). This Opinion adopts similar usage of the name ValueAct. ValueAct is in the business of investing in securities.

The amended complaint does not allege that the entities designated "ValueAct" are in any way related to ValueAct Capital Partners, L.P., of which Ubben is the founder and managing partner. Nor does it allege that Ubben is involved with ValueAct either as an investor or a manager. During oral argument on these motions, plaintiff's counsel suggested that Ubben is the manager and founding director of ValueAct and that he obtained his seat on MSO's board as a result of ValueAct's purchase of Stewart's and Doerr's MSO shares. This would imply that Ubben is somehow implicated in misdirecting these transactions away from MSO and to Stewart and Doerr, and that Ubben was rewarded for doing so with a seat on MSO's board of directors. No allegations of this type are made in the amended complaint and they are not considered by the Court in ruling on these motions to dismiss.

ner, Doerr, sold 1,999,403 shares of MSO to ValueAct.

### C. Split–Dollar Insurance

MSO provides Stewart with what is commonly termed a "split-dollar" insurance policy. The premiums for such policies are paid entirely or in large part by the employer. Paid-in premiums grow tax-free over the life of the policy. Upon the retirement of the employee, the employer is reimbursed for its premium contributions out of the cash value of the policy. The remaining cash balance in the policy continues to grow tax-free, and the proceeds are used to pay premiums as they come due during the remainder of the now-retired former employee's life. In addition, the retired employee can make periodic tax-free withdrawals from the policy after the employer's contributions have been reimbursed, so long as the cash value of the policy is adequate to generate sufficient funds to pay the premiums as they come due.

Some have suggested that split-dollar insurance constitutes an interest-free loan to the employee on whose behalf the policy is purchased. If so, such policies could run afoul of recent federal legislation banning loans to corporate executives and directors.[10] A spokesperson for MSO stated that, in light of the questions raised regarding the nature and propriety of split-dollar insurance policies for executives,

MSO's lawyers and accountants would be evaluating the advisability of paying the premiums in the future and would make a determination before the next premium payment came due in February 2003.

## II. ANALYSIS

### A. Motions to Dismiss Counts II, III, and IV—Court of Chancery Rule 12(b)(6)

In ruling on a motion to dismiss under Rule 12(b)(6), the Court considers only the allegations in the amended complaint, and any documents incorporated by reference therein.[11] For this purpose, the Court accepts as true all well-pled factual allegations contained in the amended complaint,[12] but conclusory statements—those unsupported by well-pled factual allegations—are not accepted as true.[13] The Court will draw all inferences logically flowing from the amended complaint in favor of the plaintiff but only if such inferences are reasonable.[14] The Court will not dismiss under Rule 12(b)(6) any claim unless it appears to a reasonable certainty that the plaintiff cannot prevail on any set of facts which might be proven to support the allegations in the amended complaint.[15]

### 1. Count II—Failure to Monitor Stewart's Personal Activities

Count II of the amended complaint alleges that the director defendants and de-

10. *See* Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204 § 402(a), 116 Stat. 745, 787–88 (codified at 15 U.S.C. § 78m(k) (2003)).

11. *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.,* 691 A.2d 609, 612–13 (Del.1996); *Orman v. Cullman,* 794 A.2d 5, 15–16 (Del.Ch.2002).

12. *Orman,* 794 A.2d at 15.

13. *Grobow v. Perot,* 539 A.2d 180, 187 (Del. 1988) (stating that "conclusory allegations of fact or law not supported by allegations of

specific fact may not be taken as true"), *overruled in part on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

14. *Id.* (stating that the Court "need not . . . draw all inferences from [the allegations] in plaintiffs' favor unless they are reasonable inferences").

15. *Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985).

fendant Patrick breached their fiduciary duties by failing to ensure that Stewart would not conduct her personal, financial, and legal affairs in a manner that would harm the Company, its intellectual property, or its business.

■ The "duty to monitor"[16] has been litigated in other circumstances, generally where directors were alleged to have been negligent in monitoring the activities of the corporation, activities that led to corporate liability.[17] Plaintiff's allegation, however, that the Board has a duty to monitor the personal affairs of an officer or director is quite novel. That the Company is "closely identified" with Stewart is conceded, but it does not necessarily follow that the Board is required to monitor, much less control, the way Stewart handles her *personal* financial and legal affairs.[18]

■ In *Graham v. Allis–Chalmers Manufacturing Co.*, the Delaware Supreme Court held that "absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists."[19] Despite this statement's implication that a duty to monitor may arise when the board has reason to suspect wrongdoing, it does not burden MSO's Board with a duty to monitor Stewart's *personal* affairs.

First, plaintiff does not allege facts that would give MSO's Board any reason to monitor Stewart's activities before mid–2002 when the allegations regarding her divestment of ImClone stock became public. Second, the quoted statement from *Graham* refers to wrongdoing *by the corporation*. Regardless of Stewart's importance to MSO, she is not the corporation. And it is unreasonable to impose a duty upon the Board to monitor Stewart's personal affairs because such a requirement is neither legitimate nor feasible. Monitoring Stewart by, for example, hiring a private detective to monitor her behavior is more likely to generate liability *to* Stewart under some tort theory than to protect the Company from a decline in its stock price as a result of harm to Stewart's public image.[20]

---

**16.** The "duty to monitor" is not a separate fiduciary duty, but rather stems from the core fiduciary duties of care and loyalty. The parties argue at length about whether this duty stems from the duty of care, the duty of loyalty, or both as it relates to MSO's § 102(b)(7) charter provision. I need not, nor do I, decide from which duty the "duty to monitor" flows in order to reach my conclusion as to Count II.

**17.** *See In re Abbott Laboratories S'holders Litig.*, 325 F.3d 795 (7th Cir.2003); *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del.Ch.1996); *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268 (Del.Ch.1995).

**18.** Plaintiff concedes that the Board recognized the importance of Stewart to MSO and has already exercised some level of care *ex ante* (through terms included in her employment agreement) in protecting the Company from possible harms caused by Stewart's personal activities. For example, the amended complaint states that:

> Because of the importance of defendant Stewart's public image to the Company and to the value of the trademarks and intellectual property that she has licensed to it, her employment agreement expressly provides that she may be terminated for cause if she is convicted of a felony or engages in gross misconduct that "results in material and demonstrable damage to the business or reputation of the Company."

Am. Compl. ¶ 19.

**19.** 188 A.2d 125, 130 (Del.1963).

**20.** One could even imagine that if the board hired a private detective to monitor Stewart's personal activities and that action were to become public knowledge, the lack of trust implied in such an action could itself tarnish Stewart's public reputation, harming MSO's business prospects and its shareholders.

Even if I accept that the board knew that Stewart's personal actions could result in harm to MSO, it seems patently unreasonable to expect the Board, as an exercise of its supervision *of the Company*, to preemptively thwart a personal call from Stewart to her stockbroker or to fully control her handling of the media attention that followed as a result of her *personal* actions, especially where her statements touched on matters that could subject Stewart to criminal charges. Plaintiff has not cited any case to support this new "duty" to monitor personal affairs. Since the defendant directors had no duty to monitor Stewart's personal actions, plaintiff's allegation that the directors breached their duty of loyalty by failing to monitor Stewart because they were "beholden" to her is irrelevant. Count II is dismissed for failure to state a claim.

### 2. *Count III—Stock Sales by Stewart and Doerr*

■ Count III of the amended complaint alleges that Stewart and Doerr breached their fiduciary duty of loyalty, usurping a corporate opportunity by selling large blocks of MSO stock to ValueAct. Defendants Stewart and Doerr are essentially in the same position with respect to Count III.[21] The basic requirements for establishing usurpation of a corporate opportunity were articulated by the Delaware Supreme Court in *Broz v. Cellular Information Systems, Inc.*:

[A] corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position [inimical] to his duties to the corporation.[22]

In this analysis, no single factor is dispositive. Instead the Court must balance all factors as they apply to a particular case.[23] For purposes of the present motion, I assume that the sales of stock to ValueAct could be considered to be a "business opportunity." I now address each of the four factors articulated in *Broz*.

#### a. Financial Ability of MSO to Exploit the Opportunity

■ The amended complaint asserts that MSO was able to exploit this opportunity because the Company's certificate of incorporation had sufficient authorized, yet unissued, shares of Class A common stock to cover the sale to ValueAct. Defendants do not deny that the Company could have sold previously unissued shares to ValueAct. I therefore conclude that the first factor has been met.

#### b. Within MSO's Line of Business

■ An opportunity is within a corporation's line of business if it is "an activity as

---

**21.** Doerr contends in the briefing on this motion that he resigned from MSO's board before the sale of Kleiner, Perkins' MSO stock to ValueAct on March 14, 2002. Doerr also disputes that plaintiff has alleged that Kleiner, Perkins, the entity that owned the shares sold to ValueAct, and of which Doerr is a general partner, is an alter ego of Doerr and is under his control. Even if Doerr's contentions fail (and I express no opinion as to whether they would upon a fully developed record), my decision on this count would not be affected.

For purposes of this motion, Doerr is treated as if he were a director of the Company on March 14, 2002 and that he sold the MSO shares to ValueAct personally. Stewart does not dispute her fiduciary status as an officer and director of the Company at the time she sold shares to ValueAct.

**22.** 673 A.2d 148, 155 (Del.1996).

**23.** *Id.*

to which [the corporation] has fundamental knowledge, practical experience and ability to pursue." [24] Because I have already determined that MSO had sufficient authorized but unissued shares available and because no special expertise is required to issue stock, I find that the "ability to pursue" prong is met. The question then becomes whether selling its own stock is an activity as to which the Company has fundamental knowledge and practical experience.

 Plaintiff states that the Company's line of business is "creat[ing] 'how-to' content and domestic merchandise for homemakers and other consumers." [25] Nevertheless, the Court recognizes that raising capital is a fundamental activity in which businesses are often engaged. MSO made its initial public offering in October 1999. Therefore, in a strictly literal sense, the Company, like any stock corporation, "has fundamental knowledge and practical experience" in the activity of selling its stock in exchange for capital contributions. This conclusion, however, does not help plaintiff in this instance. MSO is a consumer products company, not an investment company. Simply stated, selling stock is not the same line of business as selling advice to homemakers. Further, I would presume that a company's "line of business" is one that is intended to be profitable. By definition, a company's issuance of its stock does not generate income. [26] For the foregoing reasons, I therefore conclude that the sale of stock by Stewart and Doerr was not within MSO's line of business.

### c. MSO's Interest or Expectancy in the Stock Sales

 A corporation has an interest or expectancy in an opportunity if there is "some tie between that property and the nature of the corporate business." [27] Requiring a tie to the "nature of the corporate business" implicates many of the issues discussed above regarding MSO's line of business. The *Broz* Court found that the company in that case, CIS (a company in the business of providing cellular phone service to the Midwest), had no interest or expectancy in the Michigan–2 license in question because CIS was divesting its cellular license holdings and its business plan did not contemplate any new acquisitions. [28] Here, plaintiff does not allege any facts that would imply that MSO was in need of additional capital, seeking additional capital, or even remotely interested in finding new investors. Had MSO wished to do so, it had a readily available, liquid market in which to accomplish that aim, as MSO's Class A stock is traded on the New York Stock Exchange.

I fail to see any connection between the potential sale of stock to ValueAct and the nature of MSO's business. Further, issuance of new shares without a need or desire for new capital is perceived to have negative effects on preexisting shareholders, as the new capital may not be effectively used to increase earnings at the same time that the preexisting shareholders' proportionate interests in the corporation have decreased. Plaintiff presents no indication that MSO had any expectation, interest, or necessity to raise capital

24. *Guth v. Loft,* 5 A.2d 503, 514 (Del.1939).

25. Am. Compl. ¶ 13.

26. *See* 26 U.S.C. § 1032 (2003) (no gain or loss recognized for tax purposes on issuance of stock); PAUL MUNTER & THOMAS A. RATCLIFFE, APPLYING GAAP & GAAP §§ 15.01–15.02 (Release No. 35, 2002) (same rule for accounting purposes).

27. *Broz,* 673 A.2d at 156 (quoting *Johnston v. Greene,* 121 A.2d 919, 924 (Del.1956)).

28. *Id.*

through new issuances of stock, nor can I reasonably infer such from the amended complaint. In the absence of specific allegations indicative of corporate interest or expectancy, I must conclude that this factor of the *Broz* test has not been met.

### d. Whether the Stock Sales Placed Stewart and Doerr in a Position Inimical to Their Duties to MSO

"[T]he corporate opportunity doctrine is implicated only in cases where the fiduciary's seizure of an opportunity results in a conflict between the fiduciary's duties to the corporation and the self-interest of the director as actualized by the exploitation of the opportunity."[29] Given that I have concluded that MSO had no interest or expectancy in the issuance of new stock to ValueAct, I fail to see, based on the allegations before me, how Stewart and Doerr's sales placed them in a position inimical to their duties to the Company. Were I to decide otherwise, directors of every Delaware corporation would be faced with the ever-present specter of suit for breach of their duty of loyalty if they sold stock in the company on whose Board they sit.

Additionally, Delaware courts have recognized a policy that allows officers and directors of corporations to buy and sell shares of that corporation at will so long as they act in good faith.[30] A corporation generally "has no interest in its outstanding stock or in dealing in its shares among its stockholders."[31] Plaintiff cites only one case purported to be to the contrary—*Thorpe v. CERBCO, Inc.*[32] *Thorpe* involved a bidder who approached the management of Insituform East, Inc. desirous to purchase the company.[33] In bad faith, management withheld this information from the outside directors, lied by saying that the bidder had not expressed interest in purchasing the company, threatened to block any sale of the entire company, and simply informed the board a bidder wished to buy the inside directors' controlling interest.[34] I would attempt to compare the well-pled facts in this case to those in *Thorpe,* but I am unable to do so because the amended complaint fails to provide *any* factual detail about the circumstances surrounding the stock sales, alleging only that the transactions occurred.

Delaware jurisprudence favors certainty and predictability.[35] Directors must "make decisions based on the situation as it exists at the time a given opportunity is presented."[36] In the absence of allegations based on well-pled facts that call into question the propriety of Stewart and Doerr's sales at the time they made them, it is impossible to infer that they acted in bad faith in selling their shares or placed themselves in a position inimical to their

---

29. *Id.* at 157.

30. *See Brophy v. Cities Serv. Co.,* 70 A.2d 5, 8 (Del.Ch.1949) (noting that "in the absence of special circumstances, corporate officers and directors may purchase and sell its capital stock at will, and without any liability to the corporation"); *Frantz Mfg. Co. v. EAC Indus.,* 501 A.2d 401, 408 (Del.1985) (stating that "directors have the right to deal freely with their shares of stock and to dispose of them at the best price they are able to obtain, so long as they are acting in good faith").

31. *Tuckman v. Aerosonic Corp.,* 1982 WL 17810, at *9, 1982 Del.Ch. LEXIS 452, at *25 (Del.Ch.) (quoting 3 Fletcher Cyclopedia of the Law of Private Corporations (Perm. ed.) § 900).

32. 676 A.2d 436 (Del.1996).

33. *Id.* at 438.

34. *Id.* at 439.

35. *See Broz,* 673 A.2d at 159.

36. *Id.*

duties to MSO. Given the allegations before me, the fourth factor of the *Broz* test is not met.

On balancing the four factors, I conclude that plaintiff has failed to plead facts sufficient to state a claim that Stewart and Doerr usurped a corporate opportunity for themselves in violation of their fiduciary duty of loyalty to MSO. Count III is dismissed in its entirety under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[37]

### 3. *Count IV–Split–Dollar Insurance*

■ Count IV alleges, "[p]utting aside whether the approval of such policies ... [was] proper, [the defendants] have failed to act responsibly and address the impropriety of the Company's payment of split-dollar insurance policy premiums."[38] Although it is possible that such policies ultimately will be held to violate certain provisions of Sarbanes–Oxley,[39] the amended complaint fails to state a claim under Delaware law. Plaintiff does not allege that the premiums paid by MSO were unlawful, that MSO failed to disclose the existence of the policy, or that the Board failed to take action once the governing law changed. To the contrary, plaintiff alleges merely that the split-dollar policies *might* be held to be unlawful, then admits that the Board properly disclosed the existence of the policy in its April 1, 2002 Definitive Proxy Statement, and further concedes that the Company's lawyers and accountants were looking into whether the policy should be unwound.

On the facts pled, this case is analogous to *Caremark.*[40] In *Caremark*, it was alleged that the board of directors breached its fiduciary duties by failing adequately to address potential violations by Caremark's employees of federal and state laws prohibiting the payment of kickbacks relating to Medicare and Medicaid patients. At one time, it was unclear whether such kickbacks were prohibited. In approving a settlement in the case, then-Chancellor Allen remarked that "the record tends to show an active consideration by Caremark management and its Board of the ... programs that ultimately led to the company's indictment" and that the failure to accurately predict the severe consequences to the company as a result of the violations did not give "rise to an inference of breach

37. There is some controversy in the parties' briefs as to whether the opportunity for the ValueAct sales was presented to the board by Stewart or Doerr. In *Broz,* the Supreme Court clearly stated, "It is not the law of Delaware that presentation to the board is a necessary prerequisite to a finding that a corporate opportunity has not been usurped." *Id.* at 157. Presenting an opportunity to the board simply provides, "a kind of 'safe harbor' for the director, which removes the specter of a *post hoc* judicial determination that the director or officer has improperly usurped a corporate opportunity." *Id.* I have concluded that the amended complaint fails to plead properly that Stewart and Doerr usurped a corporate opportunity, regardless of whether it was ever presented to the board. Since they were under no separate obligation to present it, the count cannot be sustained

whether a presentation was made or not. Plaintiff in her brief in opposition to defendants' motions suggests that discovery under Court of Chancery Rule 56(f) is necessary before this claim can be resolved. As has been demonstrated by my analysis of Count III, I do not agree. Plaintiff's belated request for discovery under Rule 56(f) is denied.

38. Am. Compl. ¶ 71.

39. Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204 § 402(a), 116 Stat. 745, 787–88 (codified at 15 U.S.C. § 78m(k) (2003)). My decision on the motions to dismiss Count IV does not bear in any way on the merits of whether such policies may be inconsistent with the provisions of Sarbanes–Oxley.

40. 698 A.2d 959.

of any duty imposed by corporation law upon the directors of Caremark." [41]

Although I do not have a developed record before me at this stage of the litigation, plaintiff here has conceded that MSO's Board has considered and is considering, with the assistance of expert advisors, the potential ramifications of continuing the split-dollar insurance policy. Two key elements necessary to proving a breach of fiduciary duty claim in this instance would be that (1) the directors knew or should have known that a violation of the law was occurring and, (2) "the directors took no steps in a good faith effort to prevent or remedy that situation." [42] Giving full weight to the facts pled in the amended complaint, I must conclude that plaintiff is unable to meet this test, and has thus failed to state a claim on which relief can be granted.

Plaintiff also asserts in Count IV that the policy was improper, noting that "[a]dditionally, and under any circumstance, the conduct allege [sic] herein does not deserve any such reward." [43] The complaint is unclear as to whether this is a separate, albeit oblique, allegation, challenging the Board's business judgment when taking out the policy in the first place, or whether it calls into question the continuation of premium payments. Nevertheless, such a vague and conclusory statement is inadequate to sustain Count IV, and it is therefore dismissed.

### B. Motions to Dismiss the Amended Complaint—Court of Chancery Rule 23.1

Defendants have moved to dismiss the amended complaint under Court of Chancery Rule 23.1 for failure to make demand upon MSO's board of directors or adequately to plead why demand would be futile. On a motion to dismiss pursuant to Rule 23.1, the Court considers the same documents, similarly accepts well-pled allegations as true, and makes reasonable inferences in favor of the plaintiff—all as it does in considering a motion to dismiss under Rule 12(b)(6).[44] Rule 23.1, however, confers substantive rights that result in derivative complaints being subjected to more stringent pleading requirements.[45] The plaintiff must state with particularity the efforts made to cause the company's board of directors to take action on the matters of concern to the plaintiff—to state how demand was made.[46] If, as in this action, the plaintiff has failed to make a demand on the board, the plaintiff must state with particularity the reasons that demand should be excused.[47]

Plaintiff concedes that demand was not made but asserts that demand would be futile because the board of directors is incapable of acting independently and disinterestedly in evaluating demand with respect to plaintiff's claims. As a practical matter, because Counts II through IV are dismissed for failure to state a claim, I need only determine whether demand would be futile with re-

---

41. *Id.* at 961.

42. *Id.* at 971.

43. Am. Compl. ¶ 71.

44. *See White v. Panic,* 783 A.2d 543, 549 (Del.2001).

45. *See Rales v. Blasband,* 634 A.2d 927, 932 & n. 7 (Del.1993); *Emerald Partners v. Berlin,* 1993 WL 545409, at *3, 1993 Del.Ch. LEXIS 273, at *7 (Del.Ch.); *Pogostin v. Rice,* 1983 WL 17985, at *2–3, 1983 Del.Ch. LEXIS 437, at *7 (Del.Ch.), *aff'd,* 480 A.2d 619 (Del.1984).

46. CT. CH. R. 23.1.

47. *Id.*

spect to Count I.[48] Count I alleges that Stewart breached her fiduciary duties to MSO and its shareholders by selling (perhaps illegally) shares of ImClone in December of 2001 and by public statements she made regarding that sale. Because this claim does not challenge an action of the board of directors of MSO, the appropriate test for demand futility is that articulated in *Rales v. Blasband.*[49] Particularly, the Court's task is to evaluate whether the particularized allegations "create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[50] *Rales* requires that a majority of the board be able to consider and appropriately to respond to a demand "free of personal financial interest and improper extraneous influences."[51] Demand is excused as futile if the Court finds there is "a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on demand."[52]

The original complaint was filed on August 15, 2002. At that time the board members were defendants Stewart, Patrick, Martinez, Seligman, Moore, and Ubben. Thus, these six individuals constitute the board for purposes of evaluating demand futility.[53] Demand is required if, in view of all the particularized allegations in the complaint and drawing all reasonable inferences in favor of the plaintiff, there is no reasonable doubt of the ability of a majority, here four of the six directors, to respond to demand appropriately.

### 1. *Inside Directors; Stewart and Patrick*

Defendants do not suggest that either Stewart or Patrick should be considered disinterested, independent, and able to consider demand on Count I without interference of improper extraneous influences. Still, Rule 23.1 places the burden on the plaintiff to specify in the complaint the reasons why demand would be futile.

■ The amended complaint alleges that in her sales of ImClone stock and subsequent statements on the subject, Stewart not only breached her fiduciary duties to MSO and its shareholders but may have committed criminal acts. It seems that these allegations indicate a significant likelihood that Stewart may be both civilly and criminally liable with respect to these actions. This is sufficient to raise a reasonable doubt of Stewart's disinterest in the challenged acts. I find that Stewart must be considered incapable of appropriately considering demand with respect to Count I.

■ Patrick is the president, chief operating officer, and a director of MSO. Her 2001 compensation included $980,000 in salary and bonuses along with a grant of options to purchase 130,000 Class A shares

**48.** Demand futility analysis is conducted on a claim-by-claim basis. *See Yaw v. Talley,* 1994 WL 89019, at *9, 1994 Del.Ch. LEXIS 35, at *27 (Del.Ch.); *Needham v. Cruver,* 1993 WL 179336, at *3, 1993 Del.Ch. LEXIS 76, at *9–10 (Del.Ch.). Because I have dismissed all other claims for failure to state a claim, there is no need to determine whether demand would have been required as to Counts II, III, and IV.

**49.** 634 A.2d 927 (Del.1993).

**50.** *Id.* at 934.

**51.** *Id.* at 935.

**52.** *Id.* at 930.

**53.** *See, e.g., Haseotes v. Bentas,* 2002 WL 31058540, at *4–5, 2002 Del. Ch. LEXIS 106, at *14 (Del.Ch.); *Needham,* 1993 WL 179336, at *3, 1993 Del.Ch. LEXIS 76, at *8–9; *Harris v. Carter,* 582 A.2d 222, 229–32 (Del.Ch.1990).

of MSO. Based on the magnitude of compensation described flowing to Patrick from her work at MSO, I find that Patrick has a material interest in her own continued employment. Because Stewart is the company's chairman and chief executive, controls over 94% of the shareholder vote, and is the "personification of [MSO's] brands as well as [its] senior executive and primary creative force,"[54] Stewart certainly has the ability to affect Patrick's employment and compensation at MSO. As described above, Stewart is personally interested in the subject matter of Count I. This raises a reasonable doubt whether Patrick can evaluate and respond to demand on Count I without being influenced by improper consideration of the extraneous matter of how pursuit of that claim would affect Stewart's interests.[55]

Although I find these allegations sufficient alone to excuse demand with respect to Patrick, the amended complaint makes two additional allegations worth mentioning. Patrick is also the secretary of M. Stewart, Inc., which the amended complaint describes as "one of Stewart's personal companies."[56] It seems a reasonable inference, even without more specific allegations, that Stewart can control whether Patrick remains in that position. What the amended complaint fails to do is provide any facts to show why remaining in that position would be material to Patrick—additional facts from which the Court could reasonably infer that Patrick's interest in keeping her position as secretary of M. Stewart, Inc. may raise questions of Patrick's independence of Stewart. Final-

ly, the amended complaint asserts in a wholly conclusory fashion that Patrick and Stewart are longstanding friends. No other details about the duration, nature, or evidences of the very existence of the friendship are given. As such, there is no basis for the Court to infer that the friendship may constitute a further basis for questioning Patrick's independence.

### 2. Outside Directors; Martinez, Moore, Seligman, and Ubben

Stewart has overwhelming voting control of MSO, controlling over 94% of the shareholder vote. It is reasonable to infer that she can remove or replace any or all of the directors. This ability does not by itself demonstrate that Stewart has the capacity to control the outside directors,[57] but is not without relevance to whether there is a reasonable doubt of the outside directors' independence of Stewart. What is required in addition are allegations demonstrating that remaining on MSO's board is material to the outside directors such that they would be incapable of considering demand without this extraneous consideration having an inappropriate effect on their decisionmaking process. No such allegations are made in the amended complaint. The amended complaint does specify the various retainers, meeting fees, and other perquisites afforded the directors, but it is not obvious from the allegations that such compensation would be sufficient to entice any of the outside directors to ignore fiduciary duties to MSO and its shareholders. Nor does

54. Am. Compl. ¶ 16 (quoting MSO's public offering prospectus).

55. This does not call into question Patrick's *disinterest* with respect to demand on Count I as alleged in the amended complaint. Rather it raises a reasonable doubt of Patrick's *independence* of Stewart, who is considered an interested party with respect to Count I.

56. Am. Compl. ¶ 3.

57. *See Aronson v. Lewis*, 473 A.2d 805, 816 (Del.1984) (noting that "proof of majority ownership of a company does not strip the directors of the presumption[] of independence").

plaintiff suggest that the outside directors have a history of blindly following Stewart's will or even accepting her recommendations without adequate independent study and investigation.[58]

■ The amended complaint also describes two of the outside directors, Martinez and Moore, as having longstanding friendships with Stewart. Notwithstanding defendants' arguments to the contrary, some professional or personal friendships, which may border on or even exceed familial loyalty and closeness,[59] may raise a reasonable doubt whether a director can appropriately consider demand.[60] This is particularly true when the allegations raise serious questions of either civil or criminal liability of such a close friend. Not all friendships, or even most of them, rise to this level [61] and the Court cannot make a *reasonable* inference that a particular friendship does so without specific factual allegations to support such a conclusion.

■ The factual allegations regarding Stewart's friendship with Martinez are inadequate to raise a reasonable doubt of his independence. While employed by Sears, Martinez developed business ties to MSO due to Sears' marketing of a substantial quantity of MSO products. Martinez was recruited to serve on MSO's board of directors by Beers, who is described as Stewart's longtime personal friend and confidante and who was at that time an MSO director. Shortly after Martinez joined MSO's board, Patrick was quoted in a magazine article saying, "Arthur [Martinez] is an old friend to both me and

**58.** At oral argument, plaintiff's counsel suggested that the MSO board should have fired Stewart before the announcement of the federal indictment and of the SEC civil action. The failure to do so is purported to be a strong indication that the board as a whole is dominated and controlled by Stewart. This argument is unpersuasive for two reasons. First, the sole factual allegation upon which this inference is to be made is merely that Stewart was not removed from her positions as board chairman and chief executive officer before the indictment but has since been replaced. Even at oral argument plaintiff could not make factual allegations that would support an inference (1) that the board failed to consider what if any action might be taken in response to the negative media attention; (2) that the board failed to evaluate the risks and benefits of possible responses including those likely to result from taking no action; or (3) that the board's decision to wait before taking action was made on any basis other than the business judgment that to take action prematurely could unnecessarily worsen any harm to MSO and its shareholders that was already resulting from the negative publicity. The identification of which matters were or were not officially considered by the directors is precisely the sort of information that should be readily ascertainable by a shareholder through a books and records action authorized under 8 *Del. C.* § 220. Second, the allegation is simply not made in the amended complaint and therefore cannot be considered by this Court for the purpose of demand futility analysis.

**59.** *See Grace Bros. v. UniHolding Corp.*, 2000 WL 982401, at *10, 2000 Del.Ch. LEXIS 101, at *32 (Del.Ch.) (finding reasonable doubt whether a director impartially could consider demand adverse to the interests of his brother-in-law); *Mizel v. Connelly*, 1999 WL 550369, at *4, 1999 Del.Ch. LEXIS 157, at *11–14 (Del.Ch.) (observing that close familial ties should "go a long (if not the whole) way toward creating a reasonable doubt").

**60.** *See In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 937–39 (Del.Ch.2003) (discussing candidly the tension in Delaware law with respect to whether and how non-monetary factors may enter into the independence analysis).

**61.** *See Abrams v. Koether*, 766 F.Supp. 237, 256 (D.N.J.1991) (noting that "allegations that making demand would call on the Defendants to sue their friends, family and business associates are insufficient" to demonstrate demand futility).

Martha [Stewart]."[62] Weighing against these factors, the amended complaint discloses that Martinez has been an executive and director for major corporations since at least 1990. At present he serves as a director for four prominent corporations, including MSO, and is the chairman of the Federal Reserve Bank of Chicago. One might say that Martinez's reputation for acting as a careful fiduciary is essential to his career–a matter in which he would surely have a material interest. Furthermore, the amended complaint does not give a single example of any action by Martinez that might be construed as evidence of even a slight inclination to disregard his duties as a fiduciary for *any* reason. In this context, I cannot reasonably infer, on the basis of several years of business interactions and a single affirmation of friendship by a third party, that the friendship between Stewart and Martinez raises a reasonable doubt of Martinez's ability to evaluate demand independently of Stewart's personal interests.

■ The allegations regarding the friendship between Moore and Stewart are somewhat more detailed, yet still fall short of raising a reasonable doubt about Moore's ability properly to consider demand on Count I. In 1995, Stewart's lawyer, Allen Grubman, hosted a wedding reception for his daughter. Among those in attendance at the reception were Moore, Stewart, and Waksal. In addition, *Fortune* magazine published an article in 1996 that focused on the close personal friendships among Moore, Stewart, and Beers.

In September 2001, when Beers resigned from MSO's board of directors, Moore was selected to replace her. Although the amended complaint lists fewer positions of fiduciary responsibility for Moore than were listed for Martinez, it is clear that Moore's professional reputation similarly would be harmed if she failed to fulfill her fiduciary obligations. To my mind, this is quite a close call. Perhaps the balance could have been tipped by additional, more detailed allegations about the closeness or nature of the friendship, details of the business and social interactions between the two, or allegations raising additional considerations that might inappropriately affect Moore's ability to impartially consider pursuit of a lawsuit against Stewart.[63] On the facts pled, however, I cannot say that I have a reasonable doubt of Moore's ability to properly consider demand.

■ No particular felicity is alleged to exist between Stewart and Seligman. The amended complaint reports in ominous tones, however, that Seligman, who is a director both for MSO and for JWS, contacted JWS' chief executive officer about an unflattering biography of Stewart slated for publication. From this, the Court is asked to infer that Seligman acted in a way that preferred the protection of Stewart over her fiduciary duties to one or both of these companies. Without details about the nature of the contact, other than Seligman's wish to "express concern," it is impossible reasonably to make this inference. Stewart's public image, as plaintiff persistently asserts, is critical to the fortunes of

---

**62.** Am. Compl. ¶ 4.

**63.** For example, in the context of evaluating the independence of a special litigation committee, Vice Chancellor Strine found a reasonable doubt of the independence of the SLC members based on a complex web of personal and professional relationships and interactions among the SLC members and those whose alleged wrongdoing the SLC was charged with investigating. *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917. It is worth noting that this web of relationships was uncovered in part during discovery. *Id.* at 920. Perhaps the plaintiff here could have mustered the necessary facts had she used 8 *Del. C.* § 220.

MSO and its shareholders. As a fiduciary of MSO, Seligman may have felt obligated to express concern and seek additional information about the publication before its release. As a fiduciary of JWS, she could well have anticipated some risk of liability if any of the unflattering characterizations of Stewart proved to be insufficiently researched or made carelessly, There is no allegation that Seligman made any inappropriate attempt to prevent the publication of the biography. Nor does the amended complaint indicate whether the biography was ultimately published and, if so, whether Seligman's inquiry is believed to have resulted in any changes to the content of the book. As alleged, this matter does not serve to raise a reasonable doubt of Seligman's independence or ability to consider demand on Count I.

In sum, plaintiff offers various theories to suggest reasons that the outside directors might be inappropriately swayed by Stewart's wishes or interests, but fails to plead sufficient facts that could permit the Court reasonably to infer that one or more of the theories could be accurate.

Evidence to support (or refute) any of the theories might have been uncovered by an examination of the corporate books and records, to which the plaintiff would have been entitled for this purpose.[64] Board minutes or voting records, for example, could reveal if the outside directors have in the past challenged Stewart's proposals, or not, voted in line with Stewart, or in opposition to her, and shown on which issues the outside directors have been more or less likely to go along with Stewart's wishes. Armed with such information, plaintiff (and this Court) would be in a much better position to evaluate whether there exists a reasonable doubt of the outside directors' resolve to act independently of Stewart. It appears, however, that plaintiff made no such investigation, instead relying largely, if not solely, on information from media reports to support the assertion that demand would be futile.

■ It is troubling to this Court that, notwithstanding repeated suggestions, encouragement, and downright admonitions over the years both by this Court[65] and by the Delaware Supreme Court,[66] litigants

---

**64.** 8 *Del. C.* § 220; *Rales,* 634 A.2d at 934 n. 10.

**65.** *See, e.g., In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1, 2003 Del.Ch. LEXIS 61, at *1–2 (Del.Ch.); *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 279 n. 5 (Del.Ch.2003) [hereinafter *Disney II*]; *Guttman v. Jen–Hsun Huang,* 823 A.2d 492, 493 (Del.Ch.2003); *Litt v. Wycoff,* 2003 WL 1794724, at *7 & n. 40, 2003 Del.Ch. LEXIS 23, at *26 & n. 40 (Del.Ch.); *Biondi v. Scrushy,* 820 A.2d 1148, 1162 (Del.Ch.2003); *Freund v. Lucent Techs., Inc.,* 2003 WL 139766, at *4, 2003 Del.Ch. LEXIS 3, at *13–14 (Del.Ch.); *In re New Valley Corp. Derivative Litig.,* 2001 WL 50212, at *6 & n. 17, 2001 Del.Ch. LEXIS 13, at *20 n. 17 (Del. Ch.); *TCW Tech. L.P. v. Intermedia Communications, Inc.,* 2000 WL 1654504, at *3–4 & nn. 2–3, 2000 Del.Ch. LEXIS 147, at *9–11 & nn. 2–3 (Del.Ch.); *Ash v. McCall,* 2000 WL 1370341, at *15 & n. 56, 2000 Del.Ch. LEXIS

144, at *56 n. 56 (Del.Ch.); *White v. Panic,* 793 A.2d 356, 365 (Del.Ch.2000), *aff'd,* 783 A.2d 543 (Del.2001); *Mizel v. Connelly,* 1999 WL 550369, at *5 & n. 5, 1999 Del.Ch. LEXIS 157, at *16 & n. 5.

**66.** *See White,* 783 A.2d at 549–50 & n. 15; *Brehm v. Eisner,* 746 A.2d 244, 266 (Del. 2000); *Scattered Corp. v. Chi. Stock Exch.,* 701 A.2d 70, 78 (Del.1997); *Security First Corp. v. U.S. Die Casting & Dev. Co.,* 687 A.2d 563, 567 n. 3 (Del.1997); *Rales,* 634 A.2d at 934 n. 10. In *Rales v. Blasband,* 634 A.2d 927, 935 n. 10 (Del.1993), the Supreme Court stated that "little use has been made of § 220 as an information-gathering tool in the derivative context" and that this situation was "generated by the 'first to file' custom seemingly permitting the winner of the race to be named lead counsel." The Supreme Court encouraged the Court of Chancery to ignore the custom of allowing the "first the file" to serve as lead counsel where a later filing plaintiff's

continue to bring derivative complaints pleading demand futility on the basis of precious little investigation beyond perusal of the morning newspapers.[67] This failure properly to investigate whether a majority of directors fairly can evaluate demand may lead to either (or both) of two equally appalling results. If there is no reasonable doubt that the board could respond to demand in the proper fashion, failure to make demand and filing the derivative action results in a waste of the resources of the litigants, including the corporation in question, as well as those of this Court. If the facts to support reasonable doubt could have been ascertained through more careful pre-litigation investigation, the failure to discover and plead those facts still results in a waste of resources of the litigants and the Court and, in addition, ties the hands of this Court to protect the interests of shareholders where the board is unable or unwilling to do so. This results in the dismissal of what otherwise may have been meritorious claims, fails to provide relief to the company's shareholders, and further erodes public confidence in the legal protections afforded to investors.

counsel was diligent and employed § 220. *Id.* Vice Chancellor Lamb continued the Supreme Court's thought in *White v. Panic*, 793 A.2d 356 (Del.Ch.2000) (*White I*), and stated that because a plaintiff did not use § 220 he would "not give a broad reading to the facts alleged in the complaint, nor [would he] infer from them the existence of other facts that would have been proved or disproven by a further pre-suit investigation." *Id.* at 364. On appeal, the Supreme Court noted that Vice Chancellor Lamb was correct in "chastising the plaintiff for his lackluster pre-suit efforts," but that "a perceived deficiency in the plaintiff's pre-suit investigation would not permit the Court of Chancery ... to limit its reading of the complaint or to deny the plaintiff the benefit of reasonable inferences from well-pleaded factual allegations." *White v. Panic*, 783 A.2d 543, 549–50 (Del.2001) (citing *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000)) (*White II*).

The Supreme Court's statement does not seem to address the true thrust of Vice Chancellor Lamb's comment. The Supreme Court stated that the Court of Chancery should not "limit its reading of the complaint," *White II* at 550, but this is wholly consistent with not giving "a broad reading to the facts alleged in the complaint," *White I* at 364. In other words, declining to expand factual inferences is not the same as actively limiting those same factual inferences. Moreover, the Supreme Court's admonition to allow "the benefit of reasonable inferences from well-pleaded factual allegations," *White II* at 550, is not inconsistent with declining to infer "the existence of other facts that would have been proved or disproven by a further pre-suit in-

vestigation." *White I* at 364. The reason for this consistency is straightforward: if a complaint is devoid of facts that could have been proved (if they existed) by use of § 220, it is not "well-pleaded," and to infer the existence of those facts, when they could easily have been proved by the use of § 220, is not "reasonable." This consistency is reinforced by the Supreme Court's statement in *White II* that it could not conclude that Vice Chancellor Lamb "limited [his] interpretation of the complaint in a manner inconsistent with the accepted standards," *White II* at 550. Ultimately, one might argue that following Vice Chancellor Lamb's interpretive suggestion would be a reasonable method to further the Supreme Court's desire to encourage the use of § 220 as it stated in *Rales.*

67. The assertion of plaintiff's counsel at oral argument that this case was filed before such investigation became a standard practice appears unfortunately to be correct but, nonetheless, does nothing to ease the mind of the Court on this point. Although I hope that adequate pre-suit investigation does become the norm, the fact that a half-dozen of the opinions just cited, *supra* note 62, were issued in the last seven months would seem to indicate that it has not yet become a matter of course. Nonetheless, fully half of the Court of Chancery opinions, *supra* note 62, and *all* of the Delaware Supreme Court opinions, *supra* note 63, cited (a group of eleven opinions that is in no way purported to be exhaustive of Delaware jurisprudence on this point) had been issued well before either the original or amended complaint was filed in this action.

The course of the litigation in *In re Walt Disney Co. Derivative Litigation* [68] is instructive on this point. In that case the shareholder-plaintiffs alleged that the director-defendants breached their fiduciary duty when they approved an employment contract with a very large severance package for president, Michael Ovitz, and when the directors granted Ovitz a non-fault termination under that contract upon his departure from Disney's employ just over a year later. [69] In October 1998, this Court granted the defendants motion to dismiss under Rule 23.1. [70] The Court determined that the amended complaint had failed to raise a reasonable doubt of whether Michael Eisner, Disney's CEO and Ovitz's longtime friend, was disinterested in the challenged transactions [71] or of whether a majority of the directors approving either the contract or the non-fault termination was independent of Eisner. [72] In addition, the Court determined that "Plaintiffs [had] failed to plead facts giving rise to a reasonable doubt that the Board, as a matter of law, was reasonably informed" when approving Ovitz's contract. [73] The complaint also failed to plead adequately that the approval of the contract amounted to waste, [74] and "[t]here [was] no allegation that the Board did not consider the pertinent issues surrounding Ovitz's termination." [75]

On appeal, the Supreme Court largely affirmed the Court of Chancery decision to grant the motion to dismiss. [76] Although troubled by the lavish compensation awarded to Ovitz in exchange for meager benefits deriving to Disney and by the "casual, if not sloppy and perfunctory" manner in which the directors addressed Ovitz's hiring and termination, the Court agreed that the amended complaint was "so inartfully drafted that it was properly dismissed under our pleading standards for derivative suits." [77] The Supreme Court, however, determined that the plaintiffs should be given an opportunity to replead (1) whether reliance on the advice of compensation expert Graef Crystal should afford the board protection against claims of breach of the duty of care [78] and (2) whether granting Ovitz a non-fault termination constituted waste. [79]

The plaintiffs then used a books and records request to investigate possible wrongdoing in relation to Ovitz's hiring and termination. [80] The second amended complaint adequately pled demand futility because the facts, which were uncovered through examination of the corporate records and documents, showed a lack of oversight so egregious that it called into question the directors' good faith exercise

---

**68.** 825 A.2d 275.

**69.** The facts as pled at various stages are given in each of the three opinions that chronicle the saga of this litigation. *See In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 355 (Del.Ch.1998) [hereinafter *Disney I* ], *aff'd in part, rev'd in part sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del.2000), *motion to dismiss denied, Disney II*, 825 A.2d 275.

**70.** *Disney I*, 731 A.2d at 355.

**71.** *Id.* at 356.

**72.** *Id.* at 361.

**73.** *Id.* at 362.

**74.** *Id.* at 363.

**75.** *Id.* at 364.

**76.** *Brehm*, 746 A.2d at 248.

**77.** *Id.* at 249.

**78.** *Id.* at 262.

**79.** *Id.* at 266.

**80.** *Disney II*, 825 A.2d at 279.

of their fiduciary duties.[81]

It would be inappropriate to speculate on the merits of the underlying claims in any case, including this one, on a motion to dismiss under Rule 23.1. Therefore I have and express no opinion regarding the merits of Count I as may have been determined had it survived for trial. I would be remiss, though, if I failed to point out that with a bit more detail about the "relationships," "friendships," and "inter-connections" among Stewart and the other defendants or with some additional arguments as to why there may be a reasonable doubt of the directors' incentives when evaluating demand with respect to Count I, there may have been a reasonable doubt as to one or all of the outside directors disinterest, independence, or ability to consider and respond to demand free from improper extraneous influences. Nevertheless, on this pleading, no such doubt is raised. The defendants' motions to dismiss the amended complaint for failure adequately to plead demand futility are granted with respect to Count I.

### C. Motion to Stay This Action—Application of the McWayne Standard

All claims made in the amended complaint have been dismissed either for failure to state a claim or for failure properly to plead demand futility. Since no claims survive the motions to dismiss, the motion to stay this action is moot.

## III. CONCLUSION

For the reasons stated above, (1) the defendants' motions to dismiss Counts II, III, and IV for failure to state a claim are GRANTED; (2) the defendants' motions to dismiss the amended complaint for failure to make demand or adequately to plead that demand is excused are there-fore moot as to Counts II, III, and IV; (3) the defendants' motions to dismiss the amended complaint for failure to make demand or adequately to plead that demand is excused are GRANTED as to Count I; and (4) the defendants' motion to stay further proceedings in this action pending the resolution of the Federal Action is mooted by the dismissal of all counts in the amended complaint.

IT IS SO ORDERED.