# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFRIE J. SILVERBERG, ANSHELL, INC., C. CHRISTY BARTON, SHERILL BARTON, BRADLEY CREGER, SHELDON DROBNY, DWAIN FORD, PETER KROLL, KEN MASHBURN, JACQUELINE MASHBURN, SERGIO NESTI, DAVID RIVERS, MARK SPERBER and MARK VICTOR, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2017-0250-KSJM |
| SHAN PADDA f/k/a KULDARSHAN PADDA, SAM TONEY, M.D., JOSEPH CARTER McNABB, DAVID J. LIPTAK, MARK DeSALVO, NORA McGUIRE, KEVIN J. KOBIELSKI, STEVEN F. LUX, CHARLENE FRIZZERA, BRADLEY M. FLUEGEL, JOHN TRBOVICH, JENNIFER DUNHAM, RIVER CITIES CAPITAL FUND II, LP, RIVER CITIES SBIC III, LP, WEST BROADWAY INTERACTIVE PARTNERS, LLC, SPRING STREET PARTNERS, L.P., MIDWEST ECONOMIC OPPORTUNITY FUND II, LP, HEALTHNOW HOLDINGS, INC., STONEHENGE GROWTH CAPITAL, LLC, STONEHENGE GROWTH EQUITY PARTNERS, LLC, BOCF, LLC, ARSENAL VENTURE PARTNERS, II, L.P., ARSENAL VENTURE PARTNERS IIA, L.P., ARSENAL VENTURE | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

PARTNERS II – FLORIDA, L.P.,  )
FLORIDA OPPORTUNITY FUND,  )
INC., TRIDENT HEALTH  )
INTEGRATED, INC., STONE POINT  )
CAPITAL, LLC, and HEALTH  )
INTEGRATED, INC.,  )
 )
        Defendants.

**MEMORANDUM OPINION**

Date Submitted:  June 27, 2019
Date Decided:  September 19, 2019

Robert Karl Hill, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware; Eric W. Berry, BERRY LAW PLLC, New York, New York; *Counsel for Plaintiffs Jeffrie J. Silverberg, Anshell, Inc., Sherrill Barton, Bradley Creger, Sheldon Drobny, Dwain Ford, Peter Kroll, Ken Mashburn, Jacqueline Mashburn, Sergio Nesti, David Rivers, Mark Sperber, and Mark Victor.*

Marc S. Casarino, Nicholas R. Wynn, Christopher S. Marques, WHITE AND WILLIAMS LLP, Wilmington, Delaware; *Counsel for Defendants Shan Padda, Sam Toney, Joseph Carter McNabb, David J. Liptak, Mark DiSalvo, Nora McGuire, Kevin J. Kobielski, Steven F. Lux, Charlene Frizerra, Bradley M. Fluegel, John Trbovich, Jennifer Dunham, and Health Integrated, Inc.*

Thad Bracegirdle, Scott B. Czerwonka, WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; Robert P. Johnson, Emily G. Monton, Emily M. Gallagher, THOMPSON HINE LLP, Cincinnati, Ohio; *Counsel for Defendants River Cities Capital Fund II, LLP, River Cities SBIC, III, LP, Midwest Economic Opportunity Fund II, LP, Stonehenge Growth Capital, LLC, Stonehenge Growth Equity Partners, LLC and BOCF, LLC.*

Samuel A. Nolen, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John A. Tucker, FOLEY & LARDNER, LLP, Jacksonville, Florida; *Counsel for Defendants Arsenal Venture Partners II, L.P., Arsenal Venture Partners IIA, L.P., Arsenal Venture Partners II – Florida, L.P., and Florida Opportunity Fund, Inc.*

Gregory W. Hauswirth, LEECH TISHMAN FUSCALDO & LAMPL, LLC, Wilmington, Delaware; David A. Weicht, Lisa A. Mantella, LEECH TISHMAN

FUSCALDO & LAMPL, LLC, Pittsburgh, Pennsylvania; *Counsel for Defendants West Broadway Interactive Partners, LLC, Spring Street Partners, L.P.*

Edward B. Micheletti, Lauren N. Rosenello, Bonnie W. David, Andrew D. Kinsey, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendants Stone Point Capital, LLC and Trident HI, Inc.*

David J. Teklits, Thomas P. Will, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Alan J. Bozer, PHILLIPS LYTLE LLP, Buffalo, New York; *Counsel for Defendants HealthNow Holdings, Inc.*

**McCORMICK, V.C.**

In 2017, substantially all of the assets of Health Integrated, Inc. were acquired by a third-party. Health Integrated's preferred stockholders received the entirety of the consideration from this transaction in accordance with the liquidation preferences set forth in the company's Certificate of Incorporation. The common stockholders, including the plaintiffs, received nothing. The plaintiffs were among the company's earliest investors. They acquired Health Integrated common stock before the first issuance of preferred stock and were unaware that the company had issued any preferred stock with liquidity preferences. They were surprised to receive no consideration from the asset sale and commenced this litigation. In their complaint, the plaintiffs accuse the Health Integrated board members who approved each financing transaction of doing so in breach of their fiduciary duties. They further claim that the counterparties to the financing transactions aided and abetted these breaches.

The complaint is ambitious, asserting twenty-two claims against twenty-eight parties. The defendants responded with equal ambition, moving to dismiss the complaint in its entirety. The defendants collectively filed fourteen different briefs making eighteen different arguments for dismissing the claims against them. In the end, three of their arguments do most of the work. This decision holds that: Certain of the counts plead derivative claims and that the complaint fails to meet the standard for pleading demand futility under Court of Chancery Rule 23.1. Certain of the

1

claims are untimely and barred by the doctrine of laches. And certain of the counts otherwise fail to state a claim.

All that potentially survives the defendants' motions are a handful of claims challenging two preferred stock issuances and related amendments to the Certificate of Incorporation in January 2016 and June 2016, plus a claim seeking an annual stockholder meeting pursuant to Section 211 of the Delaware General Corporation Law. This decision requests targeted supplemental briefing concerning those issues.

## I. FACTUAL BACKGROUND

The facts are drawn from the Second Amended Complaint,[1] documents it incorporates by reference, and judicially noticeable facts.

### A. Formation and Initial Capitalization of Health Integrated

Health Integrated, Inc. ("Health Integrated" or the "Company") was incorporated in Delaware in 2003 by Shan Padda and Sam Toney, who held Health Integrated common stock and originally comprised the Company's board of directors.

The plaintiffs own Health Integrated common stock. Most of them, Anshell, Inc., Christy Barton, Sherill Barton, Bradley Creger, Sheldon Drobny, Dwain Ford, Peter Kroll, Ken Mashburn, Jacqueline Mashburn, Sergio Nesti, David Rivers, Mark

---

[1] C.A. No. 2017-0250-KSJM Docket ("Dkt.") 33, Verified Sec. Am. Compl. ("Sec. Am. Compl.").

2

Sperber, and Mark Victor, invested in a company named CMS HealthCare Acquisition, LLC between 2000 and 2002, and their CMS shares were exchanged for shares in Health Integrated thereafter. One plaintiff, Jeffrie J. Silverberg, invested directly in Health Integrated in January 2004 and March 2004.

Health Integrated has not noticed or conducted a stockholder meeting since at least 2004.

### B. The Financing Transactions

At various times, Health Integrated relied on financing from private investors. It did so using a combination of preferred stock and convertible debt. In their complaint, Plaintiffs challenge each financing round described below.

### 1. Financing Transactions Before April 2014

In March 2003, Health Integrated's Certificate of Incorporation was amended to authorize Series A and Series B preferred stock. Around that time, the Company sold Series A preferred stock to Defendant West Broadway Interactive Partners, LLC ("West Broadway") and the predecessor of Defendant Midwest Economic Opportunity Fund II, LP ("Midwest"). In April 2003, the Company sold additional Series A preferred stock to Defendant River Cities Capital Fund II, LP or River Cities SBIC III, LP (collectively "River Cities"). West Broadway, Midwest, and River Cities purchased additional Series A preferred stock in late 2003 and in the first quarter of 2004.

3

In 2005, Health Integrated's Certificate of Incorporation was further amended to modify the rights and preferences in connection with an offering of Series B preferred stock. The Company sold Series B preferred stock to West Broadway, River Cities, Midwest, West Broadway, and HealthNow New York, Inc. ("HealthNow")—a predecessor of Defendant HealthNow Holdings, Inc.

In November 2006, April 2007, and December 2007, Health Integrated issued debt instruments convertible into Series B preferred stock. River Cities, West Broadway, and Midwest acquired the convertible notes.

In January 2009, Health Integrated issued additional notes convertible into Series B preferred stock as well as warrants to River Cities and Defendants Stonehenge Growth Capital, LLC, Stonehenge Growth Equity Partners, LLC, and BOCF, LLC (collectively, "Stonehenge").

In January 2011, Health Integrated amended the 2009 notes issued to River Cities and Stonehenge. In 2012, Health Integrated issued a note to Midwest that was convertible into Series B preferred stock. In April 2013, Health Integrated amended that note. As to both of these note amendments, the Second Amended Complaint only generically alleges that the amendments provided "additional preferences and rights."[2]

---

[2] *Id.* ¶ 98.

## 2. Financing Transactions After April 2014

In March 2015, Health Integrated issued more notes convertible to Series B preferred stock as well as warrants that allowed the noteholders to purchase a specified allotment of common stock. River Cities, Midwest, and Stonehenge were among the participants in this note offering. Defendant Trident Health Integrated, Inc. ("Trident") also participated in this offering.

On January 13, 2016, Health Integrated offered convertible debentures (the "January 2016 Notes Offering"). The debentures were convertible into Series B preferred stock, and the participants also received warrants that granted them the rights to purchase common stock. Trident, Midwest, River Cities, and Stonehenge participated in this offering. Defendants Arsenal Venture Partners II, L.P., Arsenal Venture Partners IIA, L.P., Arsenal Venture Partners II-Florida, L.P. (collectively, "Arsenal") and Defendant Florida Opportunity Fund, Inc. ("Florida Opportunity") were new participants in this offering. This offering, in conjunction with the March 2015 round of financing, afforded Trident, Arsenal, and Florida Opportunity certain financial protections.

In June 2016, Health Integrated approved a new offering of notes convertible to a new stock issuance classified as Series C preferred stock (the "June 2016 New Notes Offering"). The Series C preferred stock had liquidation rights superior to all other classes of stock. Holders of notes convertible to Series B preferred stock—

5

River Cities, Stonehenge, and Midwest—exchanged those notes for new notes convertible to Series C preferred stock without contributing any additional capital. HealthNow was awarded warrants redeemable for up to $1 million of Series C preferred stock in exchange for continuing or extending its business relationship with the Company. All other holders were subordinated to the holders of Series C preferred stock in the event of a liquidation of the Company. In addition, the June 2016 New Notes Offering modified an existing management equity carve-out to (i) equal five percent of the adjusted enterprise value of the Company and (ii) guarantee distributions to management after Series C preferred stockholders but before any Series B or B-1 preferred stockholders.

Under the terms of the June 2016 New Notes Offering, the Company and its existing shareholders also agreed to a "drag-along" provision where all stockholders would follow any vote approved by Arsenal, Florida Opportunity and Trident.[3]

### C.   The Asset Sale

On December 26, 2017, substantially all of the assets of Health Integrated were acquired by an affiliate of Exlservice Holdings, Inc. for $22 million. This consideration satisfied the bulk of the Series C preferred stock's liquidation preferences. The common stockholders received no consideration.

---

[3] *Id.* ¶ 132(xii).

### D. Padda's Allegedly False Statements

The Second Amended Complaint refers to a 2001 SEC action against Padda concerning his role with a business unrelated to Health Integrated. Padda consented to an entry of final judgment in that case, which required him to pay a civil penalty and permanently enjoined him from engaging in a number of unlawful acts. SEC rules require that a public company disclose these types of injunctions against a director or executive officer. The SEC injunction does not expressly prohibit Padda from having any association with a public company, but Plaintiffs allege that it frustrated Health Integrated's ability to engage in an initial public offering because of the risk associated with Padda's role as Health Integrated's CEO. Because Health Integrated remained a private company, Plaintiffs were unaware of the injunction against Padda.

Plaintiffs additionally allege that in December 2003 and February 2004, Padda verbally indicated an intention "to cause Health Integrated to engage in a public offering or sale of the company within the near future, and that a public offering or sale of the company would enable Silverberg to liquidate any investment he made in Health Integrated and that he would be one of [a] small group of approximately 20 initial investors."[4] Plaintiffs further allege that Silverberg relied upon these statements when determining to invest in the Company.

---

[4] *Id.* ¶ 76.

In a May 24, 2004 letter "received by some but not all of the holders of common stock," Padda described Health Integrated as a "profitable" enterprise.[5] The May 2004 letter informed its recipients of the Series A preferred stock transaction. The Second Amended Complaint does specify who among the Plaintiffs received the letter and does not allege with particularity that any Plaintiff relied upon the contents of the letter to his or her detriment.

In a January 24, 2005 letter Plaintiffs describe as written to "shareholders," Padda stated: "We continue to tweak the organization's personnel and processes while we still have the luxury of doing it as a private company."[6] Plaintiffs allege that the January 2005 letter's reference to being a private company "suggested that Health Integrated might soon undertake a public offering."[7] The Second Amended Complaint does not specify who among the Plaintiffs received the letter and does not allege with particularity that any Plaintiff relied upon the contents of the letter to his or her detriment.

In a January 12, 2006 letter to "shareholders," Padda advised, among other things, that (i) several board members were "representatives of the financial institutions that have invested significant amounts of capital in [Health Integrated]"

---

[5] *Id.* ¶ 79.

[6] *Id.* ¶ 107.

[7] *Id.*

8

and (ii) the Company's investment advisors had recommended more enterprise value was necessary, "including possibly taking in further investment," before a liquidation event could be realized.[8] The January 2006 letter identified that Blue Cross Blue Shield of New York had made a significant investment in the Company. The Second Amended Complaint does not specify who among the Plaintiffs received the letter and does not allege with particularity that any Plaintiff relied upon the contents of the letter to his or her detriment.

In a July 30, 2009 letter to "holders of the common stock," Padda referenced the Company's ongoing discussions with strategic investors about a potential liquidity event.[9] The July 2009 letter indicated "[w]e hope to have some definitive information to share with you about this in the near future."[10] The Second Amended Complaint does not specify who among the Plaintiffs received the letter and does not allege with particularity that any Plaintiff relied upon the contents of the letter to his or her detriment.

In a March 12, 2010 email, Padda informed Plaintiff Drobny that the Company had retained an investment banking firm for the purpose of making introductions to new investors interested in buying out the original shareholders.[11]

---

[8] *Id.* ¶ 108.

[9] *Id.* ¶ 111.

[10] *Id.*

[11] *Id.* ¶ 112.

9

The Second Amended Complaint speculates that Padda did so with the intention of having Drobny pass along the information to other Health Integrated stockholders.

In a May 28, 2013 email, Padda expressed to Plaintiff Ford on May 28, 2013: "You had reached out to me a little while ago asking if things continue to break our way. Looks like all of the hard work for so many years is paying off soon. Hang in there."[12] The Second Amended Complaint argues that Padda's email should be interpreted to mean "a liquidity event was in the offering" and that Padda intended for Ford to disseminate such information to other Health Integrated shareholders.[13]

In an April 14, 2014 letter, Padda wrote to certain unidentified shareholders to disclose that institutional investors had invested in Health Integrated in excess of $20 million. Padda also summarized the distributional preferences of the preferred stock.

In an October 8, 2015 letter, Padda generally described the Company's growth and its retention of investment banker William Blair and auditor Ernst & Young to guide a potential liquidity event. The October 2015 letter explained William Blair's advice regarding delaying exploration of the liquidity event until at least the following year. The Second Amended Complaint does not specify who among the

---

[12] *Id.* ¶ 113.

[13] *Id.*

10

Plaintiffs received the letter and does not allege with particularity that any Plaintiff relied upon the contents of the letter to his or her detriment.

### E.     This Litigation

Plaintiffs commenced this litigation on April 4, 2017. Plaintiffs filed an Amended Complaint on October 26, 2017, which the defendants moved to dismiss on January 9, 2018.[14] Plaintiffs then filed the Second Amended Complaint on August 28, 2018, and the defendants renewed their motions to dismiss on September 12, 2018. The Court heard oral arguments on June 12, 2019.

## II.     LEGAL ANALYSIS

The Second Amended Complaint asserts twenty-two Counts.[15] Of those Counts, thirteen accuse the Health Integrated board members who approved particular rounds of financing of doing so in breach of their fiduciary duties. Certain of those counts also allege that the stockholders who amended the Company's Certificate of Incorporation to facilitate certain of the financing transactions breached their fiduciary duties as controllers. An additional six of those counts accuse counterparties to the financing rounds of aiding and abetting breaches of fiduciary duties. Count Twenty-One effectively seeks a remedy in the form of a declaratory judgment that certain amendments to Health Integrated's Certificate of

---

[14] The Second Amended Complaint does not pursue claims against Charlene Frizzera or Bradley M. Fluegel although their names appear in the case caption.

[15] *See* Dkt. 91, Ex. A, Chart Summary of Dismissal Args.

11

Incorporation were byproducts of these alleged breaches and are thus void or voidable. In addition, Count Five asserts claims of fraud and fraudulent inducement against Padda for statements and omissions made between 2000 and 2014,[16] and Count Twenty-Two seeks to compel an annual meeting of stockholders pursuant to Section 211 of the Delaware General Corporation Law. This decision refers to the fiduciary duty and aiding and abetting claims as the "Fiduciary Claims," the fraud and fraudulent inducement claims of Count Five as the "Fraud Claims," and the claim pursuant to Section 211 of Count Twenty-Two as the "Section 211 Claim."

The defendants have moved to dismiss all twenty-two claims on myriad bases.[17] This decision focuses on the arguments that the Second Amended Complaint failed to plead demand futility as required by Rule 23.1 and that the claims are time-barred or otherwise fail under Rule 12(b)(6).

## A. Rule 23.1

The defendants argue that all of Plaintiffs' claims are derivative and thus subject to the demand requirements of Rule 23.1, which the Second Amended Complaint does not meet. Plaintiffs respond that all but one of their claims are also

---

[16] Sec. Am. Compl., Count Five (alleging common law fraud and fraudulent inducement against Padda for his failure to disclose his SEC injunction in 2001 and 2002 when soliciting investments in CMS; for statements made in December 2003 and February 2004 to induce Silverberg's investment; for statements made to Silverberg during phone conversations held between 2004 and 2008 with Silverberg; and for statements contained within Padda's April 14, 2014 letter to shareholders).

[17] *See* Dkt. 91, Ex. A.

direct in nature and thus not subject to dismissal under Rule 23.1. They further contend that the Second Amended Complaint adequately alleges demand futility.

### 1. The Fiduciary Claims Are Derivative.

The Fiduciary Claims allege that between 2004 and 2016, various compositions of the Board approved several rounds of corporate financing, which diluted the value of Plaintiffs' stock. "Normally, claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative. . . . Such claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in value of the entire corporate entity, of which each share of equity represents an equal fraction."[18] Likewise, claims that a corporation overpaid for corporate financing, thereby diluting the value of its stock, are quintessentially derivative.[19]

In this case, Plaintiffs concede that the Fiduciary Claims are derivative, but argue that they should also be regarded as direct under the Delaware Supreme Court's holding in *Gentile v. Rossette*. Under *Gentile* and its progeny, minority stockholders may seek relief directly when a controller or control group extracts a

---

[18] *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006).

[19] S*ee El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1265 (Del. 2016) (Strine, C.J., concurring) ("A claim that an entity has issued equity in exchange for inadequate consideration—a so-called dilution claim—is a quintessential example of a derivative claim.").

13

benefit at the expense of the minority's economic and voting rights. For a *Gentile*

theory to be viable, at a minimum, a plaintiff must plead facts sufficient to establish

a controller or control group.[20] Plaintiffs' *Gentile* theory falls apart because they

have failed to allege the existence of either.

Under Delaware law, one way to establish control sufficient to give rise to

concomitant fiduciary duties is to demonstrate that a stockholder or group of

stockholders control a majority of the corporation's voting equity.[21] Plaintiffs

pursue the group theory in this case, alleging that multiple individual stockholders

owning equity in the aggregate of over fifty percent should be treated as a group with

concomitant fiduciary duties. To demonstrate the existence of a control group,

Plaintiffs must show that the investors "are connected in some legally significant

way—e.g., by contract, common ownership, agreement, or other arrangement—to

work together toward a shared goal."[22] "The law does not require a formal written

agreement, but there must be some indication of an actual agreement."[23]

---

[20] *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007), *aff'd* 951 A.2d 727 (Del. 2008) (stating that "the Delaware Supreme Court intended to confine the scope of [*Gentile*] to only those situations where a controlling stockholder exists").

[21] *Williamson v. Cox Commc'n, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)).

[22] *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009).

[23] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014) (citing *In re PNB Hldg. Co. S'holder Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006)).

As this Court explained in *In re Hansen Medical, Inc. Stockholders Litigation*, "[b]ecause the analysis for whether a control group exists is fact intensive, it is particularly difficult to ascertain at the motion to dismiss stage."[24] At the pleading stage, a plaintiff need not allege, much less prove, the existence of a "blood pact."[25] Rather, a plaintiff must plead facts from which the Court can reasonably infer an agreement or arrangement among the alleged group members. A complaint fails to meet this standard if all it "alleges is that a group of shareholders have 'parallel interests.'"[26]

In this case, Plaintiffs fail to allege more than parallel interests among the alleged group members. In briefing, Plaintiffs argue that because various investors had the same rights under the Certificate of Incorporation or notes, they should be treated as a group.[27] This sort of bare allegation does not suffice to plead the existence of a control group.

---

[24] *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3030808, at *6 (Del. Ch. June 18, 2018).

[25] *PNB Hldg. Co.*, 2006 WL 2403999, at *11 (declining to find control group post-trial after plaintiffs had advanced the argument that "any PNB stockholder with the same name and some of the same blood as a PNB director must be deemed one and the same with them").

[26] *Dubroff*, 2009 WL 1478697, at *3 (quoting *Williamson*, 2006 WL 1586375, at *6).

[27] Dkt. 75, Pls.' Corrected Br. in Opp'n to the Mots. to Dismiss ("Pls.' Ans. Br.") at 32–37.

This Court's decision in *Dubroff* is instructive. The *Dubroff* plaintiffs alleged ten facts to support an inference that three investors who caused a recapitalization comprised a control group. These investors collectively owned fifty-six percent of the voting stock, controlled the appointment of four out of five directors of the company, and had each executed the same written consent to approve the transaction.[28] This was evidence, the plaintiffs argued, of an agreement to work together to effectuate the recapitalization. The Court rejected the plaintiffs' argument, distinguishing an act of consensus from the formation of a group.[29] The Court emphasized that in approving the recapitalization, the investors were merely exercising their rights to "vote based on their own self-interest, regardless of whether their interests are consistent with the interests of other shareholders."[30]

In this case, Plaintiffs have pleaded even less regarding a transaction-related agreement than the plaintiffs pleaded in *Dubroff*. Plaintiffs argue that the venture capital fund defendants shared an unspoken *quid pro quo*, whereby each of their

---

[28] *Dubroff*, 2009 WL 1478697, at *4.

[29] *Id.* at *5 (finding that the written consent "demonstrate[d] nothing more than the fact that [the venture capital funds] each voted for the Recapitalization").

[30] *Id.* at *5; s*ee also van der Fluit v. Yates*, 2017 WL 5953514, at *6 (Del. Ch. Nov. 30, 2017) (dismissing claims based on control group theory where the alleged group members held three of seven board seats and were parties to agreements that gave each investor information and other rights unrelated to the challenged transaction, holding that no control group existed because the circumstances alleged by plaintiffs contained no "voting, decision-making, or other agreements that [bore] on the transaction challenged in [that] case").

16

board representatives approved current offerings in consideration for past or future support from other venture capital funds. But the only facts Plaintiffs allege are that the venture capital funds voted to amend the Certificate of Incorporation or their board representatives' approved the challenged transactions. Thus, the Second Amended Complaint suffers the same flaw as in *Dubroff* in that it fails to allege that the venture capital funds in this case are connected "in a legally significant way" relating to "voting, decision-making, or other agreements that bear on the transaction[s]" at issue in this case.[31] In so doing, it improperly conflates acts of consensus with the act of forming a group. Even at the plaintiff-friendly motion to dismiss stage, such allegations are not enough to support a reasonable inference of a control group.[32]

## 2. Demand Is Not Excused as to Certain Claims.

Because Plaintiffs have failed to plead the existence of a control group, their claims cannot proceed under a *Gentile* theory. Thus, the Fiduciary Claims are only derivative in nature and are subject to the pleading requirements of Rule 23.1.

---

[31] *van der Fluit*, 2017 WL 5953514, at *5–6.

[32] Because the Second Amended Complaint fails to plead facts to support a reasonable inference of a controller or control group, any claim that a stockholder breached its fiduciary duty as a controller or control group fails to state a claim and is dismissed.

17

Rule 23.1 derives from the principle that directors, and not shareholders, manage the business and affairs of Delaware corporations.[33] The directors' managerial authority includes whether to initiate or refrain from entering litigation on behalf of the corporation.[34] As part of this board-centric model, Rule 23.1 requires that a stockholder wishing to bring a derivative action first demand that the board of directors take action.[35] If a plaintiff chooses not to make a demand, the original plaintiff must plead with particularity why it would have been futile to present the matter to the board.[36]

Plaintiffs did not make pre-suit demand on the Board. Thus, to satisfy Rule 23.1, the Second Amended Complaint must plead particularized facts creating a reasonable doubt that the majority of the board of directors in service when the complaint was filed could not exercise independent and disinterested business judgment in responding to a demand.[37]

---

[33] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984); *see also* 8 *Del. C.* § 141(a).

[34] *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981).

[35] Ct. Ch. R. 23.1.

[36] *Id.*; *see also Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000).

[37] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1992); *Park Empls. & Ret. Bd. Empls. Annuity & Benefit Fund of Chi. v. Smith*, 2017 WL 1382597, at *1 (Del. Ch. Apr. 18, 2017). The operative date for this analysis is the filing of the original complaint on April 4, 2017. *See In re Fuqua Indus., Inc., S'holder Litig.*, 1997 WL 257460, at *12 (Del. Ch. May 13, 1997).

At the time Plaintiffs commenced this litigation, the Health Integrated Board comprised Padda, Toney, DiSalvo, Fluegel, Frizzera, Trbovich, Dunham, and Craren. At the pleading stage, Plaintiffs conceded that three—Fluegel, Frizzera, and Craren—were disinterested and independent, and the defendants conceded that three—Padda, Toney, and DiSalvo—were interested and lacked independence.[38] Thus, this analysis focuses on Arsenal's and Florida Opportunity's board designees—Trbovich and Dunham.

Plaintiffs argue that Trbovich and Dunham were "dual fiduciaries" and could not properly consider a demand because of their respective roles with Arsenal and Florida Opportunity. Although Plaintiffs make this argument generally to meet their burden with respect to all of the claims, the analysis called-for by Rule 23.1 must be performed on a claim-by-claim basis.[39] Neither Arsenal nor Florida Opportunity were interested in any transaction predating their respective initial investments in Health Investments in January 2016. Plaintiffs have not alleged any basis that Trbovich and Dunham were incapable of impartially considering claims challenging conduct that occurred before they joined the Board that did not involve Arsenal or

---

[38] Pls.' Ans. Br. at 30; Dkt. 44, Opening Br. in Supp. of Mot. to Dismiss Am. Compl. ("Dir. Defs.' Opening Br.") at 20 n.89.

[39] *Beam ex. rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) (citing *Yaw v. Talley*, 1994 WL 89019, at *9 (Del. Ch. Mar. 2, 1994)).

Florida Opportunity. Thus, Plaintiffs cannot meet the Rule 23.1 requirements for most of the Fiduciary Claims—Counts One through Four and Six through Fourteen.

As to Counts Fifteen through Twenty, which challenge the January 2016 Notes Offering and June 2016 New Notes Offering, Plaintiffs allege that both Trbovich and Dunham owed competing fiduciary duties to Arsenal and Florida Opportunity, entities that participated in both offerings. In the demand futility context, directors are presumed to be independent.[40] In a case where the directors considering the demand did not approve the challenged transaction, "[d]emand is excused as futile if the Court finds there is 'a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on demand.'"[41] A plaintiff may establish that a director lacks independence by alleging with particularity that the director "is sufficiently loyal to, beholden to, or otherwise influenced by an interested party," which would overcome the director's ability to impartially assess the demand.[42] Although Rule 23.1 requires a plaintiff to plead particularized facts to survive a motion to dismiss, a plaintiff is entitled to "all

---

[40] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 59 (Del. Ch. 2015).

[41] *Beam*, 833 A.2d at 977 (citing *Rales*, 634 A.2d at 930).

[42] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *11 (Del. Ch. July 26, 2018) (quoting *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017)).

reasonable inferences from the pled facts . . . in determining whether the plaintiff has met its burden."[43]

A director is a "dual fiduciary" with competing loyalties if "(i) . . . the interests of the second beneficiary diverged from those of the common stockholders; and (ii) . . . the director faced a conflict of interest because of [his or her] competing duties."[44]   More specifically, this Court has acknowledged a director faces the dual fiduciary problem when she approves a stock issuance if he or she is in a fiduciary relationship with the recipient of that stock.[45]

In this case, Plaintiffs allege that Trbovich is a managing director of various Arsenal entities and that Dunham is a partner in Arsenal entities and an officer or employee of Florida Opportunity.   Plaintiffs do not directly allege that either defendant owed fiduciary obligations to the Arsenal entities.  While it is possible for partners to contract around traditional fiduciary duties owed to a partnership,[46] it is a reasonable inference in Plaintiffs' favor that Trbovich and Dunham owed fiduciary duties to Arsenal and Florida Opportunity at the time the complaint was filed.  Thus,

---

[43] *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015).

[44] *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *30 (Del. Ch. Sept. 4, 2014), *aff'd sub nom. Fuchs v. Wren Hldgs., LLC*, 129 A.3d 882 (Del. 2015).

[45] *Id.*

[46] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 170 (Del. 2002).

21

Plaintiffs have sufficiently alleged that Trbovich and Dunham are "dual fiduciaries" who lacked independence from Arsenal and Florida Opportunity.

Even if Trbovich and Dunham did not owe conflicting fiduciary duties to the Arsenal entities, their relationship to the entities may still leave them "sufficiently loyal to, beholden to, or otherwise influenced by" Arsenal and Florida Opportunity.[47] While Plaintiffs do not plead allegations of the types of personal relationships that this Court has found to color a director's independence,[48] Delaware courts have acknowledged "the remuneration a person receives from her full-time job is typically of great consequence to her."[49] In this case, it is reasonable to infer that Trbovich and Dunham derive substantial income from their roles at Arsenal and Florida Opportunity and could not impartially consider a demand to bring a lawsuit against the entities from which they derive a substantial portion of their livelihood.[50]

As a result, demand is excused as to the claims challenging transactions with Arsenal and Florida Opportunity—Counts Fifteen through Twenty and a portion of Count Twenty-One.

---

[47] *Sciabacucchi*, 2018 WL 3599997, at *11.

[48] *See, e.g.*, *Sanchez*, 124 A.3d at 1024.

[49] *Sciabacucchi*, 2018 WL 3599997, at *12.

[50] *See id.* at *13 ("While the Complaint does not expressly allege that Nair's positions as Executive Vice President and CTO of Liberty Global constitute his primary employment, that is certainly a reasonable inference.").

22

## B.    Rule 12(b)(6)

Under Rule 12(b)(6), the defendants argue that certain claims are time-barred under the doctrine of laches and otherwise fail to state a claim.  On a motion pursuant to Rule 12(b)(6), the Court accepts "all well-pleaded factual allegations in the Complaint as true, [and] accept[s] even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[51]  "A trial court is not, however, required to accept as true conclusory allegations 'without specific supporting factual allegations.'"[52]  The Court "draw[s] all reasonable inferences in favor of the plaintiff[s], and den[ies] the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[53]  "If a prima facie basis for laches exists from the face of the complaint, the plaintiff bears the burden to plead specific facts to demonstrate that the analogous statute of limitations was tolled." [54]  If the plaintiff cannot meet his burden, his complaint will be dismissed.[55]

---

[51] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[52] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995); *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996)).

[53] *Cent. Mortg.*, 897 A.2d at 168 (citation omitted).

[54] *Bean v. Fursa Capital P'rs, LP*, 2013 WL 755792, at *6 (Del. Ch. Feb. 28, 2014).

[55] *Id.*

### 1. Most of the Fiduciary and Fraud Claims Are Time-Barred.

"Laches is an equitable defense designed to ensure that equity aids the vigilant, and not the dilatory."[56] Where a claim is pursued in the Court of Chancery that would be barred by the applicable statute of limitations if pursued at law, laches will also bar the claim absent "extraordinary circumstances."[57]

The Fiduciary Claims are subject to a three-year statute of limitations under Delaware law.[58] The Fraud Claims are governed by statutes of limitations from different jurisdictions ranging between two and five years.[59]

In this action, the original complaint was filed on April 4, 2017. The Fiduciary Claims arising from transactions dating prior to April 4, 2014 are thus beyond the

---

[56] *Daugherty v. Highland Capital Mgmt., L.P.*, 2018 WL 3217738, at *7 (Del. Ch. June 29, 2018) (citation omitted).

[57] *Id.* ("The Court does not need to engage in a traditional laches analysis for a presumptively late complaint.").

[58] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998).

[59] Plaintiffs allege, and the defendants concede, that Plaintiffs' fraud claims are governed by non-Delaware law. Under the Delaware Borrowing Statute, 10 *Del. C.* § 8121, if a claim arose in a jurisdiction that has a shorter statute of limitations than Delaware, Delaware courts apply the shorter period. *B.E. Capital Mgmt. Fund LP v. Fund.com Inc.*, 171 A.3d 140, 148 (Del. 2017). The statute of limitations for the Fraud Claims under Delaware law is three years. *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 42 (Del. Ch. 2012) (citing 10 *Del. C.* § 8106). The relevant statute of limitations for the Fraud Claims under Virgin Islands law is two years. *See Isaac v. Crichlaw*, 63 V.I. 38, 54 (Super. Ct. 2015) (citing V.I. Code Ann. tit. 5, § 31(5)(A)). The relevant statute of limitations for the Fraud Claims under Illinois and Missouri law is five years. *See Henderson Square Condo. Assoc. v. Lab Townhomes, LLC*, 46 N.E.3d 706, 720 (Ill. 2015) (citing 735 ILCS 5/13-205); Mo. Rev. Stat. § 516.120. The relevant statute of limitations for the Fraud Claims under South Carolina and California law is three years. S.C. Code Ann. § 15-3-530(5); Cal. Civ. Proc. Code § 338.

24

three-year statute of limitations.[60] Likewise, the limitations period as to all of the Fraud Claims except those relating to Padda's April 14, 2014 letter expired before this litigation commenced.[61] Thus, those claims are time-barred absent tolling.

In support of tolling the applicable limitations period, Plaintiffs invoke two theories—fraudulent concealment and equitable tolling. Fraudulent concealment occurs where an affirmative act of concealment or a misrepresentation was used to "put the plaintiff 'off the trail of inquiry.'"[62] Equitable tolling applies "even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary."[63]

Inquiry notice ceases tolling under both theories. As this Court has explained, "the trusting plaintiff still must be reasonably attentive to his interests,"[64] and the limitations period is only "suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence."[65] "Inquiry

---

[60] Sec. Am. Compl., Counts One through Four and Six through Twelve.

[61] *See id.* ¶¶ 208–225.

[62] *Krahmer v. Christie's, Inc.*, 911 A.2d 399, 407 (Del. Ch. 2006) (quoting *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 531 (Del. Ch. 2005)).

[63] *Dean Witter*, 1998 WL 442456, at *6.

[64] *Id.* at *8.

[65] *Id.* at *6 (Equitable tolling "tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong." (citing *In re MAXXAM, Inc.*, 659 A.2d 760, 769 (Del. 1995))); *id.* at *5 ("Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercised of reasonable diligence." (citing *Halpern v. Barran*, 313 A.2d 139, 143 (Del. 1973))).

25

notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued, would lead to the discovery of the injury."[66]

According to the Second Amended Complaint, Plaintiffs did not have actual notice of the preferred stockholders' liquidation preferences before Padda's April 14, 2014 letter. Before that time, Plaintiffs say they were "lulled" into foregoing prompt attempts to vindicate their rights by reassurances in the various letters transmitted to them by Padda.[67] Plaintiffs further contend that they were entitled to "rely, in complete propriety, upon the good faith of fiduciaries,"[68] although Plaintiffs do not allege with any detail that they actually relied on any statements.

Even accepting these facts as true, Plaintiffs should have been on notice of their claims long before April 14, 2014. Certain Plaintiffs invested in the Company's predecessor-in-interest, CMS, between 2000 and 2002, becoming holders of the Company's common stock in 2003 when the CMS operations were transferred to the Company. Those Plaintiffs argue they were induced into investing in CMS by a

---

[66] *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005).

[67] Pls.' Ans. Br. at 40.

[68] *Id.* (quoting *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008)).

26

promise that the CMS would soon undertake an IPO. Silverberg first invested in the Company in 2004 and similarly alleges that Padda represented to him that the Company would engage in an initial public offering "within the near future."[69]

While "soon" and "the near future" are vague statements, it is unlikely that a prudent investor would wait over thirteen years (January 2004 to April 2017) to begin inquiring about the status of a promised liquidity event. In fact, Plaintiffs were likely on inquiry notice as of January 12, 2006, when Padda sent a letter to stockholders detailing the issues facing the Company over the course of the previous calendar year. That letter begins by apologizing for a lapse in communication of almost one year and characterizes the "tremendous amount of change going on at Health Integrated" that would be "inappropriate to broadly disclose and discuss."[70] The letter goes on to describe the investments by venture capital funds "in the seven figure range," all of which had a board seat.[71] The letter also discloses a new investment by Blue Cross Blue Shield of New York "of close to $7 million."[72]

This January 12, 2006 letter should have placed Plaintiffs on notice of most of the claims they now seek to assert. At least two years had passed since Padda

---

[69] Sec. Am. Compl. ¶ 77.

[70] *Id.* ¶ 109

[71] *Id.*

[72] *Id.* ¶ 110. Plaintiffs effectively ask this Court to infer that they received this letter, although they do not plead receipt or, as discussed below, reliance with particularity.

27

allegedly promised a quick liquidity event for Silverberg, and at least three years had passed since he allegedly made similar promises to the other stockholders. Moreover, this letter put stockholders on notice that additional funding was needed and ultimately secured without the participation of common stockholders, despite Padda's original assurances to Silverberg that "he would be one of [a] small group of approximately 20 initial investors."[73] At this point, a person of "ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury."[74] Plaintiffs never—not upon receipt of the January 2006 letter or thereafter—followed-up on this communication.

Plaintiffs contend that this reasoning is not dispositive of claims that accrued after January 2006 because the economic impact of the later dilutive issuances had not yet been felt. This Court rejected a similar argument advanced in *Pomeranz v. Museum Partners, L.P.* where Plaintiff argued that "inquiry notice does not run until [plaintiff] had notice of the full economic impact of the wrong."[75] This Court was

---

[73] *Id.* ¶ 77.

[74] *Dean Witter*, 1998 WL 442456, at *7. Even if Plaintiffs were not on inquiry notice in January 2006, they would have been by July 2009, when Padda again wrote to Plaintiffs indicating that no liquidity event had occurred. This was five years after Silverberg was allegedly induced to invest in the Company, and at least seven years after the other Plaintiffs. If Plaintiffs' investments were premised on a liquidity event occurring soon thereafter, Plaintiffs should have been on notice that their rights were in need of vindication when no liquidity event transpired after multiple years.

[75] *Pomeranz*, 2005 WL 217039, at *12.

not persuaded and noted that "having all the facts necessary to articulate the wrong is not required."[76] Moreover, the January 2006 letter placed Plaintiffs on inquiry notice of Health Integrated's mode of raising capital, which included the issuance of preferred stock. Plaintiffs' failure to proactively inquire at any time after January 2006 does not inure to their benefit in the form of tolling.

Thus, Plaintiffs have not properly pleaded the availability of equitable tolling or fraudulent concealment to escape dismissal under the laches doctrine. Counts One, Two, Three, Four, most of Five, Six, Seven, Eight, Nine, Ten, Eleven, and Twelve are time-barred.

### 2. The Remaining Fraud Claims

Plaintiffs' only timely filed Fraud Claim relates to Padda's communications in his April 14, 2014 letter to certain unidentified shareholders. Of the representations Padda made in the April 14, 2014 letter, only one forms the basis of Plaintiffs' Fraud Claim, namely: "Health Integrated was exploring ways to permit holders of the common stock to liquidate their investments."[77]

The parties argue that this claim is governed by the laws of the U.S. Virgin Islands, Illinois, Missouri, South Carolina, and California.[78] Applying the statute of

---

[76] *Id.*

[77] Sec. Am. Compl. ¶ 224.

[78] The defendants do not dispute that these state laws apply. Even if there were a dispute as to the which law governed the dispute, under a conflict of laws analysis, "if application of the competing laws would yield the same result, then no genuine conflict exists 'and the

limitations of the U.S. Virgin Islands, the claims are untimely and must be dismissed.[79]   Under the laws of the other jurisdictions, the substantive requirements to plead fraud are the same.   Plaintiffs must plead: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement."[80]   "The elements of fraudulent inducement are the same [as] those of common law fraud."[81]   Plaintiffs must also meet the heightened pleading standard under Rule 9(b), which requires stating with particularity "the time, place, and contents of the false representations; the facts misrepresented; the identity of the

---

Court should avoid the choice-of-law analysis altogether.'"   *Vichi*, 85 A.3d at 773 (quoting *Devley v. DynCorp. Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010)).   The laws of these jurisdictions mirror those of Delaware, so there is no actual conflict.   *See id.*

[79] *See supra* note 59 and accompanying text.

[80] *Connick v. Suzuki Motor Co.*, 675 N.E. 2d 584, 591 (Ill. 1996); *see also Ryann Spencer Gp., Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284, 287 (Mo. Ct. App. 2008); *Hollman v. Woolfson*, 683 S.E.2d 495, 580 (S.C. 2009); *Conroy v. Regents of Univ. of Cal.*, 203 P.3d 1127, 1135 (Cal. 2009).

[81] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *12 (Del. Ch. Sept. 10, 2018) (quoting *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *11 (Del. Ch. Mar. 28, 2018)).

person(s) making the misrepresentation; and what the person(s) gained from making the misrepresentation."[82] Intent can be pled generally.[83]

Plaintiffs' fraud claim fails because Plaintiffs fail to plead with particularity that they each relied on the statement in the April 14, 2014 letter or suffered damages from that reliance. This omission stands out because Plaintiffs pleaded (or, at least, attempted to plead) reliance in connection with other, albeit time-barred, Fraud Claims.[84] Because Plaintiffs made no effort to plead each of the requirements of fraud or fraudulent inducement in connection with the April 14, 2014 letter, the remainder of Count Five is dismissed.[85]

---

[82] *GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at *10 (Del. Ch. Oct. 31, 2017) (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207–08 (Del. Ch. 2006)).

[83] *Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *8 (Del. Ch. Aug. 30, 2019).

[84] *See* Sec. Am. Compl. ¶ 216 ("Silverberg relied on these representations when he invested first $20,000 in Health Integrated in January 2004 and then an additional $60,000 in approximately March 2004."); *id.* ¶ 217 ("Silverberg would not have invested in Health Integrated were it not for the foregoing misrepresentations and omissions"); *id.* ¶ 220 ("Silverberg reasonably relied on Padda's representations in making his investment."); *id.* ¶ 228 ("Plaintiffs were entitled to rely on the accuracy of the private placement memorandum, and reasonably believed that it had accurately described Padda's biography. Plaintiffs would not have invested in CMS had the SEC injunction against Padda been disclosed.").

[85] The Second Amended Complaint argues that the October 8, 2015 letter should be interpreted as "[p]romising a liquidity event" but does not refer to this letter specifically among the Fraud Claims. *Id.* at 51, M.

### 3. The Remaining Fiduciary Duty Claims

To recap, of the Fiduciary Claims, Counts One through Four and Six through Fourteen are dismissed pursuant to Rule 23.1, and Counts One through Four and Six through Twelve are time-barred and thus fail for that alternative reason. Counts Fifteen through Twenty and a portion of Twenty-One,[86] which state derivative claims relating to the January 2016 Note Offering and June 2016 New Note Offering, meet the demand futility standard and were timely filed. Thus, the Court must now determine whether those claims meet the pleading standard under Rule 12(b)(6). On this issue, supplemental and consolidated briefing by the parties would be useful. The remaining defendants shall submit a single joint supplemental opening brief not to exceed 8,000 words concerning the basis for dismissing any remaining claims asserted against them. Plaintiffs may submit a supplemental answering brief not to exceed 8,000 words. The remaining defendants may submit a single joint supplemental reply brief not to exceed 5,000 words. In particular, this briefing ought to clarify the composition of the board that approved both offerings and the appropriate standard of review for the board's actions.

---

[86] The challenge to the January 2003 amendment is dismissed because the underlying fiduciary duty claims have been dismissed. S*upra* Parts II.A.2, II.B.1.

### 4. The Section 211 Claim

No defendants offer an argument to dismiss Count Twenty-Two. In a chart filed with the Court summarizing the defendants' arguments for dismissal, the director defendants indicate that they have made two arguments, which the Court could not locate in briefing. The parties may address this claim in their supplemental submissions. In that submission, Plaintiffs may argue that the defendants' failure to previously address this issue constitutes waiver.[87]

## III. CONCLUSION

The defendants' motions to dismiss are GRANTED in part. Counts One through Four and Six through Twelve are dismissed for failure to plead demand futility, and separately on the basis of laches. Counts Thirteen and Fourteen are dismissed for failure to plead demand futility. Count Five is dismissed in part due to laches and dismissed in part because Plaintiffs failed to state a claim under Rule 12(b)(6). Any claims asserted against Frizzera or Fluegel are dismissed. Count Twenty-One is dismissed in part.

The Court's decision on Counts Fifteen through Twenty, the portions of Twenty-One relating to the January 2016 Note Offering and June 2016 New Notes Offering, and Count Twenty-Two will be held in abeyance to permit supplemental

---

[87] *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

33

briefing in accordance with this decision. The remaining defendants and Plaintiffs shall confer on a schedule for submitting supplemental briefing.